(March 8, 1905.)

# STATE v. SEYMOUR.

[79 Pac. 825.]

SUFFICIENCY OF EVIDENCE TO SUPPORT VERDICT—EVIDENCE CONSISTENT WITH INNOCENCE—ADMISSION OF EXEMPLARS FOR COMPARISON OF HANDWRITING.

1. Where S. was arrested on a charge of the larceny of a horse, and at the time of his arrest the animal was found in his possession, and the defendant upon his trial showed that he took the horse up in pursuance of an order from one K., who, he supposed, had a right to the possession of the animal, and that he (S.) had never claimed the animal as his own, but had at all times disclaimed ownership and represented that the animal belonged to K., and that he had kept and used the animal in an open and notorious manner, and there is no conflict in any of the material facts proven, the defendant is entitled to his acquittal and a verdict against him should be set aside and a new trial granted.

2. Where all the evidence in the case is consistent with defendant's innocence, and all the circumstances shown in the case are explained on that theory and appear reasonable, the defendant should be acquitted.

3. The admission in evidence of papers irrelevant to the record for the sole purpose of creating a standard of comparison of handwriting should not be allowed except in cases where the papers are conceded to be genuine, or are such as the opposing party is estopped to deny or fall within some equally well recognized exception.

(Syllabus by the court.)

APPEAL from District Court in and for Bingham County. Honorable James M. Stevens, Judge.

The defendant was convicted of the crime of grand larceny, and from the judgment and order denying his motion for a new trial appealed. Reversed.

The facts are fully stated in the opinion.

Hawley, Puckett & Hawley and J. D. Millsaps, for Appellant.

We look in vain for any evidence which would show the act or knowledge of a criminal in the taking and keeping of the horse in question by the defendant. In the absence of any such evidence, we are bound to accept his explanation of his possession, corroborated as it is by the evidence of Kimball and Birch. This case is parallel in every material respect with the case of *State v. Seymour,* 7 Idaho, 257, 61 Pac. 1033; *State v. Marquardsen,* 7 Idaho, 352, 62 Pac. 1034. The possession of stolen property, unexplained, is evidence of guilt; but where a reasonable explanation is given, and there is no conflict of evidence in regard thereto, and the witness is not impeached, the jury cannot arbitrarily ignore such evidence before a legal conviction can be had. The state must have established the accused person's guilt of the crime charged by legal evidence and beyond a reasonable doubt, and until that is done the presumption of innocence is an absolute shield to defendant. Upon what the jury bases its verdict of guilty we cannot conceive, unless it was prejudice against the defendant. There is absolutely no evidence to sustain the verdict, and it must be presumed to have been rendered under the influence of passion and prejudice, and should be set aside. (*State v. Nesbit,* 4 Idaho, 548, 43 Pac. 66; *State v. Crump,* 5 Idaho, 166, 47 Pac. 814; *State v. Mason,* 4 Idaho, 543, 43 Pac. 63; *People v. Swinford,* 57 Cal. 86; *People v. Noregea* 48 Cal. 123; 3 Greenleaf on Evidence, sec. 31; *People v. Chambers,* 18 Cal. 383.) In many of the states the question as to whether or not a party can introduce a signature or handwriting for the sole purpose of having it compared with the handwritng in question in the cause is controlled by statute; but we think we can safely say that in all states where there is no special statute governing the matter the common-law rule prevails, and such signature or handwriting cannot be introduced as exemplars for the purpose of comparison. (*Stokes v. United States,* 157 U. S. 187, 15 Sup. Ct. Rep. 617, 39 L. ed. 667; *Hickory v. United States,* 151 U. S. 303, 14 Sup. Ct. Rep. 334, 38 L. ed. 170; *Moore v. United States,* 91 U. S. 270, 23 L. ed. 346; *Rogers v. Ritter,* 79 U. S. 317, 20 L. ed. 417; *Williams v. Conger,* 125 U. S. 414, 8 Sup. Ct. Rep. 933, 31 L. ed. 787; *United States v. McMillan,* 29 Fed.

247; *Randolph v. Loughlin,* 48 N. Y. 459; *Miles v. Loomis,* 75 N. Y. 294, 31 Am. Rep. 470; *People v. Parker,* 67 Mich. 222, 11 Am. St. Rep. 578, 34 N. W. 720; *Vinton v. Peck,* 14 Mich. 293; *Van Sickles v. People,* 29 Mich. 61; *State v. Miller,* 47 Wis. 530, 3 N. W. 33; *Pierce v. Northey,* 14 Wis. 9; *Hazelton v. Union Bank,* 32 Wis. 34; *State v. Thompson,* 132 Mo. 301, 34 S. W. 38; *Bowen v. Jones,* 13 Ind. App. 193, 41 N. E. 400; *Hazzard v. Vickery,* 78 Ind. 64; *Shorb v. Kinzie,* 100 Ind. 429; *Burdick v. Hunt,* 43 Ind. 381; *Himrod v. Gilman,* 147 Ill. 293, 35 N. E. 375; *Jumpertz v. People,* 21 Ill. 408; *Massey v. Farmers' Nat. Bank,* 104 Ill. 327; *Hanley v. Gandy,* 28 Tex. 211, 91 Am. Dec. 315; *Hammond v. Wolfe,* 78 Iowa, 227, 42 N. W. 779; *State v. Clinton,* 67 Mo. 380, 29 Am. Rep. 506; Greenleaf on Evidence, sec. 581; 1 Roscoe's Criminal Evidence, sec. 5; *Clay v. Alderson,* 10 W. Va. 49; *West v. State,* 22 N. J. L. 212; *Doe ex dem Henderson v. Hackney,* 16 Ga. 521; *State v. Givens,* 5 Ala. 747; *Kirksey v. Kirksey,* 41 Ala. 640; *Hawkins v. Grimes,* 13 B. Mon. 257; *Niller v. Johnson,* 27 Md. 6; *Tome v. Parkersburg etc. Ry. Co.,* 39 Md. 36, 17 Am. Rep. 540; *Kenney v. Flynn,* 2 R. I. 319.)

John A. Bagley, Attorney General, D. Worth Clark and O. P. Soule, for the State.

Can writings otherwise not admissible by reason of their being irrelevant to the issues in a cause be introduced in evidence for purposes of comparison? This is the question involved in the consideration of the sixth, seventh and eighth errors relied upon, and is one of the important, probably the most important, questions raised by this appeal, and a matter upon which this court has never been called upon to pass. Different courts have made different rulings upon this question, some permitting comparison by the jury or by experts of the writing already in the case and pertinent to the other issues involved, while in other cases such comparisons have not been permitted at all; while other courts of equal standing have taken the broad ground that writings either admitted to be genuine, or proved to be may be admitted as evidence for the sole purpose of comparison with the disputed writing. (See Code Civ. Proc.,

sec. 1870, subd. 9; Greenleaf on Evidence, p. 727, sec. 581;. *Calkins v. State,* 14 Ohio St. 222; *Baker v. Haines,* 6 Whart. (Fa. St.) 284, 36 Am. Dec. 224; *Moody v. Rowell,* 17 Pick. 490, 28 Am. Dec. 317; *Depue v. Place,* 7 Pa. St. 430; *Travis. v. Brown,* 43 Pa. St. 16, 82 Am. Dec. 540.) The evils that: may be suggested as likely to arise from the selection of particular writings for the purposes of comparison may be left, as all unfair or misleading evidence must be, to be corrected by other evidence and by the intelligent judgment of the court or jury. In our opinion, such evidence is conducive to the intelligent, ascertaining of the truth, and the receiving of it in this case was not error. (*Tyler v. Todd,* 38 Conn. 218; *State v. Hastings,* 53. N. H. 452; *Adam v. Field,* 21 Vt. 526; *State v. Ward,* 39 Vt.. 225; *Farmers' Bank v. Whitehill,* 10 Serg. & R. 110; *Travis v.. Brown,* 43 Pa. St. 9, 82 Am. Dec. 540; *Chance v. Indianapolis & W. G. R. Co.,* 32 Ind. 472; *Macomber v. Scott,* 10 Kan. 335;. *Wilson v. Beauchamp,* 50 Miss. 24; *Benedict v. Flanigan,* 18. S. C. 506, 44 Am. Dec. 583; *Roman v. Plunket,* 2 McCord, 518;. *Bennett v. Mathewes,* 5 S. C. 478; *McCorkle v. Binns,* 5 Binn.. 340, 6 Am. Dec. 420; *Baker v. Haines,* 6 Whart. 284, 36 Am. Dec. 224; *Vickroy v. Skilley,* 14 Serg. & R. 372; *Callan v. Gaylord,* 3 Watts, 321; *Lodge v. Phipher,* 11 Serg. & R. 333; *Farmers' Bank v. Whitehill,* 10 Serg. & R. 110; *Bank of Pennsylvania v. Jacobs,* 1 Penr. & W. 161; *Depue v. Place,* 7 Pa. St. 428;. *Homer v. Wallis,* 11 Mass. 309, 6 Am. Dec. 169; *Richardson v.. Newcomb,* 21 Pick. 317; *Commonwealth v. Eastman,* 1 Cush. 218, 48 Am. Dec. 596; *Jewett v. Draper,* 6 Allen, 435; *McKeone v. Barnes,* 108 Mass. 344; *Commonwealth v. Coe,* 115 Mass. 504; *Costelo v. Crowell,* 139 Mass. 590, 2 N. E. 698; *Lyon v. Lyman,* 9 Conn. 55; *Ort v. Fowler,* 31 Kan. 478, 47 Am. Rep. 501, 2 Pac. 580; *Holmberg v. Johnson,* 45 Kan. 197, 25 Pac. 575; *Gilmore v. Swisher,* 59 Kan. 172, 52 Pac. 426; *Wilson v. Beauchamp,* 50 Miss. 24; *Garvin v. State,* 52 Miss. 207; *Calkins v. State,* 14 Ohio St. 222; *Koons v. State,* 36 Ohio St. 195; *Tucker v. Kellogg,* 8 Utah, 11, 28 Pac. 870; *Moore v. Palmer,* 14 Wash. 134, 44 Pac. 142; *Hanriott v. Sherwood,* 82 Va. 1; *Tunstall v. Cobb,* 109 N. C. 316, 14 S. E. 28; *State v. Noe,* 119 N. C. 849, 25 S. E. 812.) The rule in force in some of the states, and

upheld by their courts, apparently for no other reason than that two hundred years ago the English courts, surrounded by entirely different conditions from those now prevailing in all civilized countries, had so decided, cannot be successfully maintained upon any theory which takes into consideration either ordinary justice or common sense. The statute of 1854 was forced upon parliament by reason of the English people having reached a point of civilization and enlightenment that precluded their longer being bounded in this regard by the narrow and unjust rulings in this regard of many of their higher courts. The new era inaugurated in the judicial procedure of the nation was hailed with delight by the highest judicial officers, as will be plainly observed by a reading of the various decisions interpreting the new statute rendered shortly after its passage; not only was the change welcomed by the courts and the people, but the text-book writers as well loudly acclaimed the benefits and justice of the change. The technical rule of the common law, which was certainly not based on common sense, and which was directly opposed to the practice of our ecclesiastical courts, of our courts in India, of the French court, and of the courts of many of the most enlightened states of America was, happily for the administration of justice, abrogated by the legislature in the year just named, so far at least as related to trials at *nisi prius.* (Cited in *Tome v. Parkersburg Ry. Co.,* 39 Md. 36, 17 Am. Rep. 561; 1 Wharton on Evidence, 717, and note; 1 Best on Evidence, 459; 7 Starkie on Evidence, 7th Am. ed., 716.)

AILSHIE, J.—The defendant in this case was informed against by the prosecuting attorney in and for Fremont county, and charged with the offense of grand larceny, committed by the defendant stealing one horse. A change of venue was granted to the defendant and the trial was had in Bingham county at the February, 1904, term of the district court therein, and the defendant was convicted and sentenced to serve a term of five years in the state penitentiary. He moved for a new trial and the motion was denied, and he thereupon appealed from the judgment and the order denying his motion for a new trial.

The principal contention urged by appellant in this court is that the evidence was insufficient to justify the verdict of the jury, and that there was no evidence to warrant the same. We have carefully examined all the evidence contained in the transcript and shall recite the material facts testified to by each witness in the case.

The prosecuting witness, George E. Little, was called and examined on the part of the state, and testified that he was the owner of the horse in question; that he had owned him for several years, and had never sold him or otherwise disposed of him and never authorized anyone to take him, and that he was running on the range near his place of residence in the month of June, 1903.

Samuel Harrop was next called and testified that he was sheriff of Fremont county at the time of defendant's arrest, and as such sheriff arrested defendant on the charge of larceny of this animal; that the arrest was made by him at St. Anthony on the fifteenth or sixteenth day of July, 1903; that he took the horse from the possession of the defendant at that time. He also testified that he had previously seen the defendant riding the horse about the city of St. Anthony, and especially on the fourth day of July, 1903, when there was a large number of people in St. Anthony, he saw the defendant riding the horse about the city and over the grounds where the celebration was being held; that he talked with the defendant on that day about the horse being a nice little horse and discussed the brand with him; said the defendant told him the horse had the three bar brand on him, and says he might have talked some with the defendant about buying the horse; that he was wanting to buy a horse at that time. The sheriff also testified that at the time he arrested the defendant and took the horse that defendant told him that a fellow had written him and asked him to take up a brown horse for him and he had done so, and this was the horse he had taken up.

Ferry Little, a son of the prosecuting witness, testified that he was acquainted with the horse taken from the defendant; that he belonged to his father, George Little, and that the horse was on the range in the early part of June. Further

testifying, he said: "I saw him [the defendant] about the 13th of July, 1903, at St. Anthony, and I asked him if he had seen a little brown horse branded three bars on the left shoulder, during his rides, and he said no, he hadn't noticed him, and described some other horses that the horse was running with, and he said he had seen those and had them in a corral and turned them out, I believe, with the exception of one brown horse; this horse I speak of was a brown horse; had one ear lopped. I believe Mr. Seymour spoke of keeping this horse in the barn and fixing his ear. He said if he should see the horse I was inquiring about he would either send the horse to me or let me know about it. I told him of the three bar brand on the horse." The witness further testified that the three bar brand was a plain brand and could readily be seen, and that that brand was on this particular horse. That after the arrest of the defendant, the witness went to the county stables in St. Anthony and got the horse, and found his foretop roached and his tail trimmed, and that he had two shoes on his front feet; that he had no shoes on him when he was turned out on the range. On cross-examination, the witness said: "I didn't mention the lazy JH brand on the horse; I didn't know the brand was on the horse at that time; the first time I noticed it was when I saw the horse in the county stable. Have known the horse four or five years." Witness further testified that the country was open and unfenced for fifteen or twenty miles around the place where his father lived, and that the horse could have gotten out in almost any direction.

Ed. S. Little testified that he saw the defendant in St. Anthony after he was arrested; saw him at the county barn in St. Anthony; he called me down and said he wanted to have a talk with me; said he would like to fix this matter up and didn't want any trouble over it, and I said the horse didn't belong to me, it belonged to my father, and he would have to fix it up with him, and he said Ferry had inquired for the horse, and it looked like he had told Ferry a damned lie about the horse because he didn't notice the brand on him, the three bars on the shoulder, that is Seymour didn't notice the brand." On cross-examination the witness said this conversation took place im-

mediately after the defendant's arrest. On redirect examination the witness said: "I am referring to the little brown horse, branded three bars on the left shoulder and a very dim, lazy JH on the left thigh, it being the horse in question in this case."

The foregoing constitutes all the evidence on the part of the state, with the possible exception of some minor and immaterial matters. After the state rested, the defendant, Emery Seymour, went on the stand and testified that he was acquainted with the horse in question and that the horse was branded JH on the left thigh and three bars on the left shoulder, and that he had known him for six or seven years; that his brother owned the horse when he first knew him and traded him to Arch. Kimball. Continuing he says: "I had the horse in my possession about the 15th or 16th of July, 1903; I received an order for the horse from Bob Birch to get him at the Seymour ranch, three miles north of Driggs, Teton Basin; Birch was riding for me at the time, and on that particular day he was herding horses that he had gathered." The witness then testified that after receiving the order he had started to St. Anthony with some horses, and after crossing the Teton river, he came across this particular horse for which he had received the order, and that he threw him in the bunch and took him on to St. Anthony; that he found him about three miles from George Little's place and across the Teton river from the Little place; that he was with other horses; that they corraled the horses and took this particular horse out of the bunch; that he kept the horse up for sometime after taking him to St. Anthony and used him as a hack horse to ride around town and drive up the cattle, and later turned him in the pasture near town, along one side of which ran the public highway. Continuing he says: "I rode him around town, what riding I had to do around town; drove cows to pasture, rode him on the 4th of July, and kept him to drive the cows to the pasture with; kept him up for a saddle horse. Birch worked for me perhaps six weeks. Birch trimmed his tail and cut his foretop one day while I was away. I had him shod. The streets are very hard here. He had been running out and was a litle sore-footed; I didn't think Kimball would want the horses ridden without it." Here the witness

produced the order which he had received through Birch from Kimball, and the same was identified and marked defendant's exhibit "1," and is as follows:

"Victor, June 27, 1903.

"Trapper, Dear Sir: Will you git up the little brown horse fore me and take care of it, the one branded H on thi. I think he is running down around the boys somewhere.

"Your friend,
"ARCHIE R. KIMBALL."

Speaking of this order the witness said: "This is the order Birch gave me from Kimball to get the horse. It is the same order and I recognize it as such; recognize the handwriting; it is Arch. Kimball's handwriting; the same Arch. Kimball that formerly owned the horse, and to whom my brother traded it; I didn't know of Kimball ever having sold or traded the horse. I am usually known by the name of Trapper. In accordance with this order I took the horse into my possession to hold for Kimball. I had a conversation with the sheriff, Samuel Harrop, in St. Anthony on the 4th of July in regard to this horse; it took place on the ball grounds right close to the back stop. There was probably four or five hundred people around there. He spoke about the horse being a very pretty little horse, and spoke about buying him and asked me if I would sell him, and I told him that I had no right to sell the horse, that it didn't belong to me. I don't remember anything being said about the brand in that conversation; if there was I didn't understand it." The defendant further testified that he supposed the horse belonged to Kimball and that he had taken him up on Kimball's order and that he had written to Kimball's brother and told him the first time he saw him to tell him that he had taken up the horse. Says that he remembers the conversation with Little in which he asked him about the horse, but that he had never noticed any brand on this horse, except the lazy JH, and that his recollection is that Little asked about a little black horse; that he, the defendant, owned several hundred head of horses, and believing that this horse belonged to Kimball he never thought of Little referring to this animal. He then refers to some of the conversations about which the wit-

nesses for the state had testified, none of which seem to contain any material facts. He further testifies that he never saw Kimball after receiving the order for the horse until the day he was arrested when Kimball came to St. Anthony, and defendant saw him about the time he was arrested.

Archie R. Kimball was next called and testified, on the part of defendant, that he resided at Victor, Bingham county, and had lived there nine years; was a farmer and engaged in the cattle business, and that he was at one time the owner of the horse which had been taken from the defendant, and that he had purchased the horse from Ed. Seymour, a brother of the defendant, in the fall of 1896, and some two years afterward sold him to one Harkness; that he had received a letter from his brother in law, Jack Edmiston, requesting him to take up this particular horse, stating that he, Edmiston, was the owner of the horse, and that the horse had gotten away from him somewhere in the Teton Basin; and that after receiving this letter from Edmiston he was riding one day on the range looking for horses and passed Seymour's place, and stopped and inquired for Seymour, and found that he was not at home, but met Birch at the place, who was then working for Seymour, and he went into the house and wrote the order, defendant's exhibit "1," and left it with Birch and requested him to deliver it to Seymour when he returned home; that Seymour was frequently called "Trapper," and that that was the reason why he addressed him as he did. Kimball identified the handwriting of defendant's exhibit "1," and testified to writing the order and that he didn't see Seymour from that time until the day of his arrest, and had no communication with him in the meantime. The letter from Edmiston to Kimball was identified by the witness, marked defendant's exhibit "2," and introduced in evidence, and is as follows:

"Wilson, Wyo., June 3d, 1903.

"Dear Brother Arch: Will you git that little brown horse that you oned fore me. I brot it down to the north end of the Basin, and he got away from me as soon as I got home with him.                    From your brother,
                              "JACK EDMISTON."

Witness testified that the exhibit was received by him through the mail, and was in the same condition that it was in when he received it.

R. A. Birch, the next witness for the defendant, testified to being at Seymour's place in June, 1903, at work for Seymour, when Kimball came to the place and had a talk with him about Seymour's whereabouts and inquired concerning this particular horse, and wanted Seymour to take him up if he found him, and finally went into the house and wrote the order, defendant's exhibit "1," which he left with Birch to be given to Seymour, and that he delivered the order to the defendant when he returned home. That thereafter, and in the latter part of June, the witness and defendant were riding in the Teton Basin and found this horse and took him up and brought him to St. Anthony with their other horses; that he was kept in the town of St. Anthony for some time, and then in the pasture close by and that they rode him and used him about town, and that Seymour never claimed to own the horse and had all the time represented that he belonged to Kimball. He also said that he roached the horse's foretop and clipped his tail as he was in the habit of doing with other horses.

William Jerrard, a farmer living near Chester, in Fremont county, testified to being present in St. Anthony on the day of defendant's arrest and hearing the conversation between Ferry Little and the defendant, and that Little asked the defendant if he had seen a little black horse running with a brown-eared horse on the range, and that the defendant told him he had not, and then related a general conversation which took place between the parties concerning the horse which Little was inquiring about.

Charles Coxsen, a liveryman at St. Anthony, testified that he had seen the defendant with this horse several times about town, and that he had examined the horse and talked to the defendant about buying the horse from him; that the defendant declined to sell him and stated to him that he was not the owner of the horse, and had no right to sell him, but that he belonged to Kimball.

R. A. Osborn, a rancher, residing at St. Anthony, testified to seeing Seymour with the horse several times and seeing him riding it, and to having tried to buy the horse from Seymour, and that the defendant declined to do so, and stated that the horse did not belong to him, but belonged to Kimball.

Alonzo Daw, a rancher living near St. Anthony, testified to substantially the same as Coxsen and Osborn, that the defendant had stated to him the horse didn't belong to him, but belonged to Arch. Kimball.

The foregoing constitutes the material facts produced by the defendant in his defense. The state thereupon produced one E. D. Jones as a witness on rebuttal, the substance of whose testimony was that he was acquainted with John Edmiston, and that he had seen him write his name; that he had a bill of sale for an animal which Edmiston had sold to the Victor Mercantile Company on July 7, 1903. After identifying the signature as being that of Edmiston, the state offered the document, being plaintiff's exhibit "A," in evidence as an exemplar, for the purpose of enabling the jury to compare the signature of Edmiston as contained on defendant's exhibit "2" with Edmiston's signature as contained on this exemplar, plaintiff's exhibit "A." The defendant objected to the introduction of this exhibit, and the objection was overruled by the court, and the exhibit was introduced and was admitted in evidence, and allowed to go to the jury for the purpose of comparison of handwriting.

It will be seen from the foregoing testimony as given by the witnesses that the only incriminating fact of any consequence produced by the state against the defendant was that the animal was found in his possession, and that it was the property of the prosecuting witness, Little, and not the property of the defendant. It will also be observed that the defendant never at any time is shown to have claimed the property as his own or to having any right to the property, other than under and by authority of this order received from Arch. Kimball. There is absolutely no conflict of evidence in this case upon any of the material issues. The defendant admits having possession of the property and that it was not his own. He shows that

he took the property in good faith, or apparently so at least, and under and by authority of an order from one whom he supposed to be the owner of the property; that when approached by persons who wanted to buy the horse he told them that he was not the owner of the horse and had no right to sell him, and that the horse belonged to Kimball. A careful examination of this record convinces us that the defendant must have been convicted upon the strength of plaintiff's exhibit "A," and on the theory that the signature to this exhibit is not the same as the signature to defendant's exhibit "2," which Kimball claims to have received through the mail from Edmiston. The two signatures may or may not have been written by the same person, but whether they were or not, that fact cannot be material in establishing the guilt of the defendant. That would have become a proper subject of inquiry had they been trying Kimball for the larceny of this animal and he had produced the letter, defendant's exhibit "2," as a justification for the taking, but upon this trial of Seymour, such evidence was immaterial, unless the state could show defendant's knowledge of the existence and fictitious character of the letter.

In this court some importance has been attached to the fact that Kimball at one place in his testimony said he received the letter, defendant's exhibit "2," about the 3d or 4th of July, which was after the date of defendant's taking the horse. The letter bears date "June 3d," and at another place in the witness' testimony he states that he received the letter soon after it was written. There is no evidence as to when it was written, except the date it bears. Again, it appears that the witness wrote the order, defendant's exhibit "1," after receiving the letter of June 3d, and it is undisputed that the order was delivered in June. It is therefore clear to my mind that the matter of this date is a mistake, either in making up the record or in the witness giving the name of the month. At any rate, it does not appear from the record that any importance was placed on this date in the trial court, as the witness' attention does not appear to have been called to this fact by cross-examination or otherwise. It could make no difference, however, to the defendant whether Kimball had received instruc-

tions from anyone to take up this horse or not, if he represented to the defendant that he had a right to the possession of the animal and instructed and ordered the defendant to take him up, and the defendant did so in good faith and never assumed to own the horse himself. These facts were sufficient to establish a want of criminal intent on the part of the defendant in the taking, and would therefore make his acts fall short of larceny. The defendant's explanation of his possession was reasonable and fair, and amply corroborated and uncontradicted in every respect, and should not have been disregarded. The undisputed evidence in this case is not only entirely consistent with defendant's innocence, but inconsistent with his guilt, and if the settled rules of law uniformly recognized in the trial of criminal cases are to be applied in this case, it becomes our duty to so declare and grant the defendant a new trial. In *State v. Nesbit,* 4 Idaho, 548, 43 Pac. 69, this court, speaking through Mr. Justice Sullivan, said: "Conceding that there is circumstantial evidence against defendant tending to establish his guilt, those circumstances can be and are as reasonably explained on other hypotheses than that of defendant's guilt or as perfectly consistent with defendant's innocence, and for that reason a new trial should have been granted." To the same effect, see *State v. Mason,* 4 Idaho, 543, 43 Pac. 63; *State v. Crump,* 5 Idaho, 166, 47 Pac. 814; *State v. Seymour,* 7 Idaho, 257, 61 Pac. 1033; *State v. Marquardsen,* 7 Idaho, 352, 62 Pac. 1034; *State v. Seymour,* 7 Idaho, 548, 63 Pac. 1036.

There is only one other assignment of error which requires our consideration, and that is as to the admissibility of plaintiff's exhibit "A," which was admitted in evidence for the purpose of comparison of handwriting. On this question counsel for the respective parties have furnished us exhaustive briefs containing a great array of authorities. The same question has been considered by this court once before and was there resolved against the contention now made by the state. In *Bane v. Gwinn,* 7 Idaho, 439, 63 Pac. 634, this court said: "In this state, in an action involving the genuineness of a signature, only such papers as are admitted in evidence in the case for other purposes and such as are admitted to be genuine should,

except in very exceptional cases, be admitted for the purpose of comparison." It can at once be seen that this case must either be reversed on account of the error committed in the admission of the state's exhibit "A," or the case of *Bane v. Gwinn* must be overruled.

After an examination of the various authorities on this subject we are not inclined to depart in any material respect from the rule as announced in *Bane v. Gwinn.* It seems to us that the correct rule which should prevail in this state where we have no statute covering the admission of such evidence, is stated by Mr. Greenleaf at section 581, volume. 1 of his work on Evidence, fifteenth edition, where he says: "But, with respect to the admission of papers irrelevant to the record, for the sole purpose of creating a standard of comparison of handwriting, the American decisions are far from being uniform. If it were possible to extract from the conflicting judgments a rule, which would find support from the majority of them, perhaps it would be found not to extend beyond this: that such papers can be offered in evidence to the jury only when no collateral issue can be raised concerning them, which is only where the papers are either conceded to be genuine or are such as the other party is estopped to deny, or are papers belonging to the witness, who was himself previously acquainted with the party's handwriting, and who exhibits them in confirmation and explanation of his own testimony." To the same effect see 15 Am. & Eng. Ency. of Law, 2d ed., 268, notes and authorities cited.

We therefore conclude that the trial court committed error in the admission of plaintiff's exhibit "A." It should be further observed in this connection that the genuineness of the signature of this witness was not admitted by the defendant, and indeed it does not appear that either he or any of his witnesses were familiar with the handwriting of the man Edmiston, and he was therefore not in a position to know anything as to the genuineness of the signature, and as we have before observed, it was a matter entirely immaterial to the issues in the case and so foreign and collateral to the real issue that it should have been excluded for that reason alone.

The judgment will be reversed and a new trial granted.

STOCKSLAGER, C. J., Concurring.—I have read the evidence in this case and carefully considered the briefs of counsel, together with all the facts disclosed by the record with a view of sustaining the judgment if it could be done under the well-established rules governing the trial of cases of this character. In my view of the case the record fails to show any circumstance, any fact or condition that warranted a conviction of the defendant on the charge of the larceny of the horse in question. The fact that he repeatedly disclaimed ownership of the horse and gave the name of the owner as he understood it; and the additional fact that he did not in any way try to conceal his possession of the horse, but, to the contrary, rode him on the streets of St. Anthony at a time when an unusual number of people were in the town; the further fact that he did not give the name of an unknown person or stranger as the real owner of the horse—are all circumstances going to show that he was in innocent possession of the animal. It will not do to say that all the parties who testified on behalf of defendant were in collusion to steal a horse, defendant being the beneficiary. Parties charged with crime of any kind have the benefit of a presumption of innocence until the contrary is shown.

While I am always in favor of enforcing the criminal laws of the state, and very much disinclined to disturb the verdict of a jury and the action of the trial court in refusing to grant a new trial, yet I cannot find sufficient evidence in the record to warrant a conviction of the defendant on this charge.

SULLIVAN, J., Dissenting.—I cannot concur in the conclusion reached by my associates. And although Mr. Justice Ailshie in the opinion of the majority of this court has set forth much of the evidence in said case, I shall of necessity have to quote considerable of the evidence literally as it appears in the transcript in order to show the inconsistency of the defendant's defense and the conflict in the evidence.

Samuel Harrop, sheriff, testified that he was acquainted with the defendant and with the horse in question. "He is a little brown horse, branded with three bars on the left shoulder and also JH on the left thigh. . . . . I saw the defendant riding

the horse on the fourth day of July in St. Anthony, Fremont county, Idaho, and had a conversation with him; I talked with the defendant about the horse and about his being a nice little horse, and asked him if the brand on the left shoulder was *three bars and he said it was."*

Ferry Little testified: "I saw the defendant during the month of July and talked with him about the horse; I saw him about the 13th of July, 1903, at St. Anthony; I asked him if he had seen a little *brown horse, branded three bars on the left shoulder,* during his rides, *and he said he had* not noticed him, . . . . and he said if he had seen the horse I was inquiring for he would either send the horse to me or let me know about it; *I told him of the three bar brand on the horse.* Q. Did you say anything about the color of the horse? A. Yes, sir. Q. What did you say? A. I asked him about a *brown* horse, dark brown; the three bar brand was a plain brand, and could readily be seen; the other was quite dim; the horse was fat in June, fat and sleek, short hair, just shed off; brands are more easily seen during that time of year; when I got the horse from the county stable there was a change in him; his foretop was roached, and his tail was trimmed out, and he had two shoes on his front feet; there was no shoes on him when we turned him out; the horse was turned over to me by the sheriff, Mr. Harrop."

Ed. S. Little testified he was acquainted with the defendant and saw him in St. Anthony shortly after he was arrested. "He said Ferry had inquired for the horse, *but it looked like he had told Ferry a damned lie about the horse, because he didn't notice the brand on him, the three bars on the shoulder that is,* Seymour had not noticed the brand."

Cross-examination: "This conversation was just after Mr. Seymour's arrest and before the preliminary. *He didn't tell me in that conversation who the horse belonged to or how he came to have it."*

Recross-examination: "Defendant didn't say at that time that Ferry had spoken of it as a black horse *and didn't mention Kimball's name in the conversation;* I don't think Kimball was

in town at that time; nothing was said about me seeing Kimball, I swear positively to that; *Mr. Kimball's name was not mentioned."*

Emery Seymour testified, on direct examination, as follows: "Birch trimmed his tail and cut his foretop one day while I was away like he did the rest of the saddle horses; I had him shod. . . . . I had a conversation with the sheriff, Sam Harrop, in St. Anthony on the 4th of July last in regard to this horse. . . . . I don't remember anything being said about the brand in the conversation; if there was I didn't understand it; there was a large crowd and everybody talking; *I didn't at that time know anything about the horse being branded three bars.* . . . . The conversation I had with Ferry Little. . . . . I met Mr. Little and he asked me if I knew anything of a little *black* horse that was running with a dock-eared horse that run on Badger creek. . . . . I had a conversation with Ed. Little at the county barn in St. Anthony the day I was arrested. As near as I can remember we were talking about this horse, *and I told him that Arch. Kimball had told me about the horse;* that he told me to get him for him, and referred him to Arch. Kimball and he didn't seem to care about talking to me; . . . . *I didn't say to him that I told Ferry Little a damned lie* or words to that effect."

Cross-examination: "In the conversation with Ferry Little at St. Anthony, Idaho, he said something about my brother owning the horse, and I told him my brother owned a good many horses; don't remember whether he said Kimball once owned the horse or not; don't think he did. He spoke about my brother owning this horse, this little black gelding; . . . . *I got the horse in question about the latter part of June;* Kimball lived at Victor during last June, twelve or thirteen miles from the range; my ranch is right north of Victor, and Ed. Little's place is a little bit north of my ranch. I took the horse to St. Anthony because he told us to gather this horse, or get him, and we were coming down to St. Anthony, and I brought him right along; *I wrote to Kimball* that I had the horse. Q. Ever notify Kimball that you had the horse? A. I wrote him. Q. Did you not testify at the preliminary that you did not notify him?

A. I don't think I did. Q. When did you write him? A. I don't know; I wrote him sometime after I took the horse down; I remember now about that. I wrote his brother at Driggs; told him to tell Arch. that I got the horse for him; I had the horse at St. Anthony between two and three weeks; I don't think I told any of the Littles anything about the order; I had the order at that time; but didn't mention the fact, but told Ed. Little *I got the horse for Kimball.* Kimball came down the very day I was arrested, I don't think it was an hour before, and I saw him about the middle of the street, *but after I was arrested* I told him Kimball was in town, and he could go up and see him; . . . . Kimball never told me in any other way than through the order to get the horse; . . . . Q. You say Bob Birch trimmed out his mane and tail after you got him down to St. Anthony? A. He trimmed his tail out and clipped his foretop out. Q. You did not do this? A. No, sir. Q. Did you not testify at your preliminary examination that you did do it? A. No, sir. Q. I will ask you if in response—if that this was not your testimony? (Soule, reading from defendant's deposition given at the preliminary.) 'Q. Is not the horse in question a very dark brown or black? A. Nothing black about him at all. Q. Did you trim the foretop and tail of the horse in question? A. Yes, sir. It was trimmed off while I had him.' Q. And this is your testimony, is it not, Mr. Seymour? A. I don't know whether it is or not. Q. I will show it to you—here is the question—you may read it, and I will ask you if this is not your testimony, if this is not your signature to it? A. Yes, that is my signature. Q. There is the question. A. I don't know why I should testify to anything of the kind at all. Q. You did testify to this, did you not? A. I did, I guess. Q. Where did you do this? Where did you trim out his mane and tail, his foretop and tail? A. It don't seem to me that I trimmed it out at all. We always trim our saddle horse tails out because they catch in the quirt and spurs; they was unhandy. Q. I will read some more: 'Did you trim the foretop and tail of the horse in question? A. Yes, sir. Q. When did you do this? A. Right here at home in twon, on or about the 2d or 1st of

July.' I presume it was trimmed about that time; I don't remember of trimming it myself. Q. Is not that your testimony? A. That's what I testified to there; I don't remember of trimming the horse's tail or foretop; have trimmed lots of colts and like as that, but as near as I can remember Mr. Birch done them, although I might have testified that I did at the preliminary; . . . . when Kimball came to town something was said about the horse; he went down to the store and when I saw him again I was arrested, and the next time I saw him the sheriff was with me; *I think that was the first time we talked about the horse;* he was at the house a very few minutes; I couldn't say positively if he spoke to me about the horse or not; I know that he knew about it; I knew where Kimball lived; *I never notified him in regard to the horse other than through his brother."*

Archie R. Kimball testified as follows: "I am acquainted with one Jack Edmiston; he is a brother in law of mine; he did reside at Wilson, eighteen miles east of Victor in the state of Wyoming, in the Jackson Hole country. *About the 3d or 4th of July* I received through the mail a letter from my brother in law, Jack Edmiston, in reference to a horse. [Witness handed defendant's exhibit "2."] This is the letter I received from Jack Edmiston; I am not acquainted with his writing; . . . . I then went back and wrote this order, and asked Mr. Birch to hand it to him. [Witness handed defendant's exhibit "1."] This is the .order I wrote on that occasion; this is my handwriting, and it was written at the Seymour house, and it was the one that I gave to Mr. Birch; I did not at any time after that receive any information with reference to the horse I was writing about, or that the order referred to; I have a brother in that section by the name of Ray Kimball. Q. You may state whether or not you had any communication with him [Ray Kimball, witness' brother] on the subject? A. Not on the horse; never mentioned the horse to me at all. Q. Did he mention receiving any news about the horse? A. No, sir."

Archie R. Kimball, recalled: "I have not talked or corresponded with him [Jack Edmiston] about this horse since he wrote me the letter. He left and I never had a chance to write

him that I found the horse referred to; never wrote him that I had the horse, or that I told Kimball to get the horse; I told Seymour; made no effort to tell Edmiston as to what I had done, and have not since; and didn't go to St. Anthony to find out about the horse; made no effort to find out whether Seymour had the horse or not, and never hunted for the horse any longer; didn't care whether I got him or not; I was riding, looking out for stock, after I gave the order; I never bothered my mind about the horse; never inquired whether Seymour got him, cared nothing about it; I came to St. Anthony the day of the hearing; I met Seymour the day of his arrest before he was arrested, and talked a few minutes with him, *but said nothing about the horse; didn't mention it."*

R. A. Birch, cross-examination: "He [meaning Arch. Kimball] did not say anything about this horse being the horse belonging to some fellow by the name of Jack Edmiston; . . . . The only brand I saw on the horse was a lazy JH on the left thigh; I didn't look for any other, never saw any other brand on the horse, but I did not examine the horse very close; I am not acquainted with the three bar brand; I am not acquainted with the little horse; the horse was in the barn on the 3d of July; I never saw the three bar brand on this horse; I rode him several times, and bridled and saddled him several times; what particularly called my attention to the JH brand was by seeing it; the horse was running by me when I noticed the brand."

In addition to the oral evidence there were four exhibits. One is dated June 27, 1903, and is the order given by Kimball to the defendant requesting him to take up and care for the horse in controversy, which letter is quoted in the opinion of Mr. Justice Ailshie. Exhibit "2" purports to be a letter from Jack Edmiston to Archie Kimball, and is also quoted by Mr. Justice Ailshie. Exhibit "A" was a bill of sale written by John Edmiston and introduced as an exemplar. Exhibit "4" was a copy of exhibit "1," and was written by the witness Kimball during his examination as a witness on the preliminary examination.

Seymour's defense was that he had taken possession of said horse on the request of Kimball as set forth in said exhibit "1," and Kimball testified that he wrote said exhibit "1" because of having received said exhibit "2," that being a request from John Edmiston to said Kimball to take possession of said horse. It is contended by counsel for the state that both of said exhibits were written by said Kimball, and were written after the defendant had taken possession of said horse. The above testimony shows that he took possession of the horse on or about the twenty-ninth day of June, 1903. He found him on the range a short distance from the owner's ranch. Exhibit "A" was shown to have been written by John Edmiston and was introduced as an exemplar, and I think it is clearly evident from said exemplar and the two other exhibits that Kimball wrote both exhibits "1" and "2," and I think it is clear that said defense of the defendant was clearly a fabrication and gotten up between Kimball and the defendant, and that the jury were fully justified in coming to that conclusion.

Kimball testified that "about the 3d or 4th of July I received through the mail a letter from my brother in law, Jack Edmiston, in reference to the horse." Said letter was exhibit No. "2." How would it be possible for Kimball to base exhibit "1," which is dated June 27, 1903, on a letter not received by him until the third or fourth day of July, 1903? He didn't receive the Edmiston letter until six or seven days after exhibit "1" was received, and Seymour, according to his own testimony, had taken possession of the horse about the 29th of June—four or five days before Kimball had received the Edmiston letter. This circumstance is enough to brand both letters as a put-up job, and the jury no doubt so concluded. And again, the sheriff testified that he saw the defendant riding said horse on the fourth day of July in St. Anthony, and had a conversation with him in regard to the horse and asked him at that time if the brand on the left shoulder was three bars, and he said it was. That statement is half denied by the defendant when he testified that he didn't remember anything about said brand being mentioned in the conversation with the sheriff, and that he didn't know anything about the

horse being branded three bars at that time. It is a little re-markable that an experienced horseman, such as the defendant is shown to be, would not notice a plain three bar brand on the left shoulder of an animal that he had ridden a number of times, as the evidence shows he had this horse. The evidence shows that he had noticed a very dim lazy JH brand on the left hip, and, as most horsemen mount a horse from the left side, to say the least, it is very remarkable that the defendant observed the very dim brand on the left thigh and had not seen the very plain three bar brand on the left shoulder. Suffice it to say the sheriff swears positively that he asked the defendant if the brand on the left shoulder was three bars and the defendant said it was. This conversation occurred on the fourth day of July.

Ferry Little testified that on about the thirteenth day of July, 1903, he asked the defendant if he had seen a little brown horse branded three bars on the left shoulder, and the defendant said he had not noticed him, and at that time he had this horse in his possession in his pasture some few miles from St. Anthony. Little swears positively that he told the defendant of the three bar brand on the horse and requested him to send the horse to him or let him know if he had found him. Little also described the horses with which the brown horse was running. Defendant denies that Little ever asked him about a little brown horse, but swears he asked him about a little black horse. Isn't it a little remarkable that the said witness, Little, would ask the defendant about a little black horse when his father had not lost a little black horse, but had lost a little brown horse branded three bars on the left shoulder? Could it be possible that Little was inquiring about a horse that had not been lost? He knew his father had lost a little brown horse with a three bar brand on the left shoulder, and that was the horse that he was inquiring about. Can it be possible that Little requested the defendant to keep an eye out for a horse that hadn't been lost? The jury evidently didn't believe the defendant's story about Little inquiring for a horse different from that which his father had lost. It seems to me that one who would believe that Little was around in-

quiring for a horse that had not been lost must be possessed of an extraordinary amount of childlike credulity, simplicity and faith. It might do to tell such story to the marines, but a jury of sensible men were warranted in disbelieving such improbable statement.

And again, E. S. Little testified that he had a conversation with the defendant shortly after he was arrested, and defendant stated to witness that Ferry, meaning Ferry Little, the former witness referred to, had inquired for the horse, but it looked like "he had told Ferry a damned lie about the horse, because he didn't notice the brand on him, the three bars on the shoulder." The defendant also denies this testimony. The jury evidently believed the testimony of said witness, as it had a right to do. The defendant took this horse from the range not far from Kimball's ranch, and instead of sending him to Kimball, he took him in an opposite direction from Kimball's ranch to St. Anthony, some forty miles from Kimball's ranch. He made no effort by letter or otherwise to inform Kimball that he had the horse, except that he says he wrote Kimball's brother. Kimball testified that he saw his brother every day or so, and his brother didn't mention the horse or the letter to him. The defendant testified that Kimball knew he had the horse. Kimball testified that he knew nothing of the kind. The defendant testified that he trimmed the horse's tail and mane and roached his foretop and put shoes on him, and admits in his testimony that he swore falsely in regard to the matter, and that Birch, a friend of the defendant's, did it. The defendant testified that he told the owner, Little, that he had taken up the horse for Kimball. The owner testified that he never told him anything of the kind. We might go further and show other contradictions, but the above is sufficient. Can it be said after a careful examination of all of the evidence in the case that there is no substantial conflict in the testimony in this case, or that defendant established the fact that he came into possession of said horse innocently? I think not. There is substantial contradiction and impeachment of the defendant, and the jury was fully justified in reaching the conclusion that the defendant was guilty. There were three witnesses procured

by the defendant who testified under the objection of counsel for the state that they had a conversation with the defendant in which he stated to them that he didn't own the horse, or that he purchased him from some unknown person. Said statements were self-serving, and the jury had a perfect right to so consider them. If in this state thieves are going to be turned loose when caught with recently stolen property, because they have said to some of their pals or others, perhaps, that they didn't own the horse, it would not be much use to attempt to convict that class of criminals in our courts.

In the opinion of the majority it is held that the admission of the bill of sale signed by Edmiston, and admitted as an exemplar, was reversible error. I do not so consider it. The man who saw Edmiston write that bill of sale appeared on the stand and testified that he saw him write it and sign it. There was no contradiction of that testimony. It is stated in note 2, page 270, 15 American and English Encyclopedia of Law, as follows: "The danger of raising collateral issue is slight when the proof of the standard is clear." In the case at bar the proof of the standard was clear. There was no collateral issue raised as to that fact or over the said bill of sale. That being true, said exemplar was properly admitted under the exception to the general rule as laid down in the majority opinion. The judgment should be affirmed.