(December 26, 1900.)

BANE v. GWINN, EXECUTOR.

[63 Pac. 634.]

GENUINENESS OF SIGNATURE—EVIDENCE—COMPARISON OF HAND-WRITING.—In this state, in an action involving the genuineness of a signature, only such papers as are admitted in evidence in the case for other purposes, and such as are admitted to be genuine, should, except in very exceptional cases, be admitted for the purpose of comparison. Where, as in the case at bar, the verdict is against the evidence, there being no substantial conflict in the evidence, the judgment based upon such verdict will be reversed upon appeal.

(Syllabus by the court.)

APPEAL from District Court, Canyon County.

Hawley & Puckett, for Appellant.

When a want of consideration is pleaded, as it is here, in an action upon a promissory note, it simply devolves upon the defendant by a preponderance of evidence to prove that no consideration was given. If no evidence was introduced, the presumption of consideration prevails, but when evidence has been introduced by defendant, the burden is thrown upon the plaintiff to satisfy the jury by a preponderance of evidence that there was a consideration. (6 Am. & Eng. Ency. of Law, 763, 764, and notes; *Campbell v. McCormack,* 90 N. C. 491; *Small v. Clewley,* 62 Me. 155, 16 Am. Rep. 410; *Delano v. Bartlett,* 16 Cush. (Mass.) 364; *Bank v. Seymour,* 64 Mich. 59.) The gift of a donor's own promissory note, either *inter vivos,* or in view of death, does not create an enforceable obligation in favor of the donee against the donor or his estate. (*Tracy v. Alvord,* 118 Cal. 655, 50 Pac. 757; 1 Daniel on Negotiable Instruments, 25; *Bartlett's Petition,* 163 Mass. 509, 40 N. E. 899; *Sanborn v. Sanborn,* 65 N. H. 172, 18 Atl. 233; *Matter of James,* 146 N. Y. 78, 48 Am. St. Rep. 774, 40 N. E. 876; *Shaw v. Camp,* 160 Ill. 425, 43 N. E. 608.) It is a rule of law that before a witness will be permitted to testify to a person's handwriting from knowledge derived from seeing papers purporting to be written by him, it must be clearly shown in the first instance that such papers were in such person's handwriting. (*Brigham v. Peters,* 1 Gray, 139; *Cunningham v. Hudson River Bank,* 21 Wend. 587; *Sartor v. Bollinger,* 59 Tex. 411; *Gugett v. Bolton,* 46 Vt. 228; *Gibson v. Trowbridge,* 96 Ala. 357, 11 South. 365.) Can writings otherwise not admissible by reason of their being irrelevant to the issue in a cause, be introduced in evidence for purposes of comparison. The principal grounds for the exclusion of irrelevant writings as a standard of comparison are, first, danger of bias or unfairness in the selection of specimens, and, second, the danger of raising collateral issues. (*Caulkins v. State,* 14 Ohio St. 222; *Baker v. Haynes,* 6 Whart. (Pa.) 284, 36 Am. Dec. 224; *Moody v. Rowell,* 17 Pick. 490, 28 Am. Dec.

317; *Depew v. Place,* 7 Pa. St. 430; *Travis v. Brown,* 43 Pa.
St. 16, 82 Am. Dec. 540; *Jumpertz v. People,* 21 Ill. 420.) The
decisions of the various states favoring the doctrine of admis-
sion of exemplars for the purpose of comparison only, en-
deavor to show that many jurisdictions favor such practice and
uphold such contention, although no statute is in force upon the
subject.    (*Morrison v. Porter,* 35 Minn. 425, 59 Am. Rep. 331;
29 N. W. 54; *Tyler v. Todd,* 36 Conn. 218; *Moody v. Rowell,* 17
Pick. 490, 28 Am. Dec. 317;    *State v. Hastings,* 53 N. H. 452;
*Adam v. Field,* 21 Vt. 526; *State v. Ward,* 39 Vt. 225; *Farm-
ers' Bank v. Whitehill,* 10 Serg. & R. 110; *Travis v. Brown,*
43 Pa. St. 9, 82 Am. Dec. 540; *Chance v. I. & W. G. R. Co.,*
32 Ind. 472; *Macamber v. Scott,* 10 Kan. 355; *Wilson v. Beau-
champ,* 50 Miss. 24.)

Brown & Cahalan and W. E. Borah, for Respondents.

As to the question as to the genuineness of the signature,
we were compelled, upon both sides, to rely upon the testimony
of those who were acquainted with his signature and those
who testified from exemplars admitted to be in his handwriting.
We introduced the merchants, the banker of the deceased and
those who had known him and were acquainted with his signa-
ture.    The defense, it is true, presented evidence against this
of the same kind of witnesses, but it was all a question of fact for
the jury, and the jury having passed upon the matter, is final.
The last announcement of this rule, by our supreme court, is
found in the case below, where it is said: "Where there is a sub-
stantial conflict in the testimony, the verdict of the jury will not
be disturbed on appeal." (*Simpson v. Remington,* 6 Idaho,
681, 59 Pac. 360; *Spalding v. Railway Co.,* 5 Idaho, 528, 51
Pac. 408; *Sears v. Flodstrom,* 5 Idaho, 314, 49 Pac. 11; *Com-
mercial Bank v. Lieuallen,* 5 Idaho, 47, 46 Pac. 1020.)
Counsel claim that there was no delivery or consideration.
The possession of the note by plaintiff is proof of delivery.
"Possession of a note by the payee is presumptive evidence
of its delivery." (*Garrigus v. Home Society,* 3 Ind. App. 91,
50 Am. St. Rep. 262, 28 N. E. 1009.)    The note itself imports
a consideration.    (*Winters v. Rush,* 34 Cal. 106; *Flint v.*

*Phipps,* 16 Or. 437, 19 Pac. 549; *Stewart v. Street,* 10 Cal. 372; *Perot v. Cooper,* 17 Colo. 80, 28 Pac. 391, 31 Am. St. Rep.. 258; *Brumback v. Oldham,* 1 Idaho, 710; *Bagley v. Eaton,* 10 Cal. 126; *Poncin v. Furth,* 15 Wash. 201, 46 Pac. 241.) "Courts, both of law and of equity, refuse to disturb contracts on grounds of mere inadequacy, whether the consideration is of benefit to the promisor or of injury to the promisee." (*Caldwell v. Ruddy,* 2 Idaho, 1, 1 Pac. 339; *Worth v. Case,* 42 N. Y. 362; *Earl v. Peck,* 64 N. Y. 596; *Daggett v. Simons,* 173 Mass. 340, 53 N. E. 907, 46 L. R. A. 332; *Gardner v. Merritt,* 32 Md. 78, 3 Am. Rep. 116; *Grymes v. Hone,* 49 N. Y. 17, 10 Am. Rep. 313.) Inadequacy of consideration, without fraud, is no defense. (*Dean v. Carruth,* 108 Mass. 242; *Giddings v. Giddings,* 51 Vt. 227, 31 Am. Rep. 682.) Mr. Lawson says that a person is acquainted with the handwriting of another so as to admit of his testimony: 1. "When he has seen that person write, whether often or seldom, much or little, recently or long ago; 2. When he has received documents purporting to be written by that person in answer to documents written by himself or under his authority and addressed to that person. 3. When, in the ordinary course of business, writings purporting to be written by that person have passed through his hands." (Lawson on Expert Testimony, 288; *Redding v. Redding,* 69 Vt. 500, 38 Atl. 230; 1 Wharton on Evidence, sec. 708; 1 Greenleaf on Evidence, sec. 577; *Bradford v. People,* 22 Colo. 157, 43 Pac. 1013; *Salazar v. Taylor,* 18 Colo. 538, 36 Am. St. Rep. 303, 33 Pac. 369; *Jacob v. Watkins,* 10 App. Div. 475, 42 N. Y. Supp. 6; *Sill v. Reese,* 47 Cal, 344; *Burdell v. Taylor,* 89 Cal. 613, 26 Pac. 1094; *Stone v. Moore* (Tex. Civ. App.), 48 S. W. 1097.) The supreme court of the United States has said: "Mere papers, not otherwise competent, cannot be introduced for the purpose of enabling the jury to institute a comparison of handwriting, yet where other writings admitted or proved to be genuine are properly in evidence, for other purposes, the handwriting of such instruments may be compared by the jury with that of the instrument or signature in question." (*Stokes v. United States,* 157 U. S. 667, 15 Sup. Ct. Rep. 617; *Hickory v. United*

*States,* 151 U. S. 303, 14 Sup. Ct. Rep. 334; *Moore v. United States,* 91 U. S. 271; *Rogers v. Ritter,* 12 Wall. (U. S.) 317; *Williams v. Conger,* 125 U. S. 414, 8 Sup. Ct. Rep. 933; *United States v. McMillan,* 29 Fed. 247; *People v. Parker,* 67 Mich. 222, 11 Am. St. Rep. 578, 34 N. W. 720; *Randolph v. Loughrin,* 48 N. Y. 459; *Miles v. Loomis,* 75 N. Y. 294, 31 Am. Rep. 470; *Vinton v. Peck,* 14 Mich. 293; *Van Sickle v. People,* 29 Mich. 261.)

HUSTON, C. J.—This action is brought by the plaintiffs against the defendant, as the executor of the last will and testament of Mervin H. Gill, deceased, to recover from said estate the amount alleged to be due upon a certain promissory note alleged by plaintiffs to have been executed and delivered by said Gill in his lifetime to Belle Bane, a married woman, and one of the plaintiffs, for the sum of $4,500 and interest. Said note having been presented for allowance to the said executor, and by him rejected, this action is brought for the recovery of the same. The answer of defendant denies the execution and delivery of the note by the decedent, and also alleges that there was no consideration therefor. The case was tried by the district court for Canyon county, with a jury, upon the issues presented by the pleadings. Two questions are presented by the record: 1. Was the note sued upon in this action the note of Mervin H. Gill, deceased? 2. Was said note, if executed and delivered to plaintiffs, so executed and delivered without consideration?

Upon the first proposition a large number of witnesses testified upon both sides. The first witness presented by the plaintiffs to establish the genuineness of the signature to the note is C. P. Bilderback, who testifies in substance as follows: "I have resided at Emmett, Canyon county, Idaho, for ten years, and engaged in the mercantile business most of the time, and resided about one mile from M. H. Gill, and was well acquainted with him. Have known him about twenty-five years. For the last few years he has been an invalid. I had business relations with him for six years that I was in business there. . . . . The signature to that note, to the best of my knowledge

and belief, is that of M. H. Gill. The writing in the body of that note is that of John McNish, a merchant in Emmett. . . . . I think Mr. Gill became an invalid six or seven years ago He apparently lost the use of his legs, and could not walk. He was not confined to his house all the time. Think, though, that the last year or two he was confined to his house. I retired from business, and ceased dealing with Mr. Gill in '96, and since that time have had no business relations with him." The next witness for plaintiffs was Sherman G. King, who testified in substance as follows: "I reside in Boise City, and have a general agency office. I was clerk of the district court, *ex-officio* auditor and recorder of Ada county, for four years, and was acquainted with M. H. Gill in his lifetime. Knew him perhaps ten or twelve years. Dont' know that I was intimately acquainted with him. Was quite well acquainted with him—well enough to go and see him when I went out there, and I have seen him several times in Boise. I knew his signature. I have seen signatures that I believed were his upon recorded documents. I presume I have seen his signature a half a dozen times, maybe, during the last ten or twelve years. I think I would know his signature. (Plaintiffs' Exhibit 'A' handed to witness.) Q. You may state, in your opinion, whose signature that is, from your best knowledge of Mr. M. H. Gill's signature. A. I believe that is the signature of M. H. Gill, to the best of my knowledge and belief. It was from January, 1891, to January, 1893, that I saw his signature on recorded documents. Certain documents came into my possession as recorder of Ada county purporting to be signed by Mr. Gill, and acknowledged. I have seen one of the documents since that time. Saw it on yesterday. It was a deed from Mr. Gill to some other person. I do not know whom. I examined it on yesterday. Have only examined that one document. (Counsel for plaintiffs hands counsel for defendant the deed referred to by witness, being a deed from M. H. Gill to John Bane and Belle Bane, dated August 17, 1891,) Do not recollect any other deeds or documents outside of this particular one. I examined what purported to be Gill's handwritng down here on various checks,

and one petition, I believe. That deed is the only document passing through my hands as recorder that I have a distinct recollection of. I have an idea there were others, but I am not certain in regard to that. I am not positive that I ever saw Mr. Gill write. Have a faint recollection I saw him sign some papers at his home. I would not say positively, however. If I did, it was some two or three years ago. I paid no attention to it. Was just there as a visitor, calling." The testimony of Judson Allerton, a witness on part of plaintiffs, is to like effect. Howard Sebree, another witness on the part of the plaintiffs testifies in substance as follows: "Have been in the banking business at Caldwell for over thirteen years as president of the First National Bank. I met M. H. Gill once or twice during his lifetime. He has done some business through the bank. I have become acquainted with his signature, more or less, as I would with most any class of customers. Have seen his checks and certificates of deposits. He did business seven or eight years at the bank. (Plaintiffs' Exhibit 'A' handed witness.) Q. From your knowledge of Mr. Gill's signature, whose signature is that? A. In my opinion, that is M. H. Gill's signature, and, in my opinion' it is a genuine signature." Mr. Sebree also gives various reasons for and explanations of the grounds upon which his opinion is based. John McNish, a witness on the part of the plaintiffs, testifies in substance as follows: "I reside at Emmett, Canyon county, Idaho, and have been engaged in the mercantile business for five years, and was acquainted with M. H. Gill in his lifetime. Knew him about thirteen years, and did a good deal of cash business with him. Mr. Gill had a book account at my store during the time that I have been in business there, and have observed his signature, and received checks and orders from him. He would do about one hundred dollars' worth of business a year. We cashed his checks frequently during the five years that I have been in business. He was affected with paralysis, and was not able to walk, and for the last four or five months was not able to get out of his house. I never called on him. (Plaintiffs' Exhibit "A"

handed witness.) I wrote the body of this note. I wrote it upon a written order purporting to have been signed by M. H. Gill. I accepted it as his signature, and had no doubt about it when I received it. I wrote it according to instructions in the order, and rolled the order up with the note, and sent it back. Belle Bane presented the order. She is one of the plaintiffs herein. I heard she was stopping at Mr. Gill's at the time. I had no conversation with Mrs. Bane in regard to the note at the time that I drew it, having known Gill's signature ever since I had been in business. Q. You may state, in your opinion, whose signature that is, Mr. Mc-Nish, to that note to the best of your opinion. (Objected to by defendant for the same reason as hereinbefore stated. Objection overruled to which ruling of the court defendant excepts, and assigns the same as one of the grounds for new trial herein.) (Witness resumes:) In my opinion, it is the signature of M. H. Gill." Other witnesses were called by the plaintiffs, all of whom gave their opinions in favor of the genuineness of the signature to the note in question, and all of whose opinions were based upon a comparison of the signature to the note with other signatures of the deceased. Many witnesses were introduced by the defendant, who with equal opportunities, and apparently of equal intelligence, unhesitatingly expressed the opinion that the signature signed to note in question was not that of the deceased, Mervin H. Gill. Numerous exhibits, consisting of checks, orders, and other papers purporting to bear the signature of deceased, were introduced, and received in evidence, as were also certain photographs of papers and signatures.

In view of this condition of the testimony, it is contended by the respondents that the appellant court should not disturb the verdict of the jury. The rule contended for is, we are inclined to think, sometimes invoked or recognized by courts to avoid responsibility; but, be that as it may, it is subject to exceptions. The rule is based upon the theory that in the trial of a case depending wholly upon questions of fact the trial court, having the witnesses before it, hearing their testimony, observing their manner of testifying, and being enabled to observe

their appearance and deportment while under examination, is better qualified to judge of the weight to be given to their testimony than is an appellate court, which simply takes the testimony, from the record; but when the testimony is by deposition, or, as in the case under consideration, is mere matter of opinion, and the evidence upon which such opinion is based is before the appellate court, the reason for the rule is not apparent.  There is no question of credibility of witnesses in this case.  The elaborate arguments presented by some of the witnesses upon both sides in support of the grounds upon which they base their conclusions, while they exhibit careful study and industrious research, are still mere matters of opinion.  A most elaborate and instructive dissertation upon this question of expert testimony in regard to handwriting will be found in an article upon the celebrated *Howland Will Case,* 4 Am. Law Rev. 625.  In that case some of the most eminent scientists of the United States, including such men as Professor Eben N. Horsford, at one time professor of chemistry of Harvard College; Professor Benjamin Pierce, formerly of Harvard College, at the time superintendent of the coast survey; Professor Agassiz, whose reputation is as wide as the dominion of civilization; Dr. Oliver Wendell Holmes —are found giving diverse opinions with a most startling degree of positiveness. In fact, we think we are not far from expressing the consensus of judicial opinion when we say that of all testimony upon which courts are called to pass that of expert witnesses upon questions of handwriting is the most unsatisfactory.

Much of the briefs of both appellant and respondents is taken up with a discussion of the rule adopted by the trial court in the admission of testimony.  The district court held that only such papers purporting to bear the signature of the party whose signature was the subject of controversy as were in evidence in the case for other purposes, or were conceded to be genuine, were admissible.  We are inclined, in the absence of any statute establishing a different rule, to hold with the lower court upon this proposition; although we think occasions may arise where the latitude of the rule should be extended. The defendant M. B. Gwinn testified as follows: "I am the executor of the estate of M. H. Gill, and reside at Boise, and am in the insurance business.

I knew M. H. Gill intimately about twenty-five years, and had business relations with him. In about 1891 he became partially paralyzed from double curvature of the spine. He first lost the use of his lower limbs entirely, but afterward he regained some feeling in them; got so he could get out, and get into a phaeton, and ride around the country. He transacted his own business before he became a cripple. I would take checks over to the bank and deposit them for him, and also would collect interest on deposits that he would have, and figure up notes for him. I was acquainted with his business affairs to such a degree that in later years he asked me at different times to go over his papers and notes, and make a list of them. He could only write his name. He always had money in notes and cash to the extent of about $8,000 to $12,000, and owned some land. He owned the old homestead and one hundred and sixty acres adjoining. His mother died in 1896. L. D. Gill, father of M. H. Gill, died in 1891. To my knowledge M. H. Gill settled all of his bills, and he ran very few. He ran store bills in Emmett, but paid them every sixty days. He never was in debt but a very few dollars at a time, and that was simply store bills at Emmett. He always had money in the bank. I have assisted him in drawing checks on several occasions, and have seen him sign checks and other documents. (Witness handed Plaintiffs' Exhibit 'B' for examination.) (Witness resumes:) That is the will. I was present when it was signed, and he made the signature to the will. Mr. L. L. Feltham and J. M. Martin were also present. The two days we were fixing up his will for him he was under considerable strain, and I think he was a little weaker after he signed this will than before. We had been doing considerable work in settling his affairs. Gill wrote his name 'Mervin Gill' at the suggestion of his attorney, and I called his attention to it, and told him that there would have to be an 'H,' there, so that it would be 'Mervin H. Gill'; so he added the 'H.' after his name was written." "Mrs. Bane and her husband, the plaintiffs, were endeavoring to purchase the ranch belonging to Mr. Gill, upon which he was living. Mrs. Bane stated to me she would like to have the old place very much. This was about May 10 or 11, 1899, and I afterward had conversation with Mr.

Gill in regard to the sale of the ranch. I will not be real positive, but I think Mrs. Bane was near the door of the sick room the time I asked him what his price was on the ranch. Just as I was bidding Merv. good-by (I was going home), I said to him: 'Merv., what is your price on this ranch? Belle has talked about possibly buying it, or making some trade with you?' He said, 'If she should want it, it is $4,000, but if anybody else wants it, it will be $4,500; but I don't think they can raise the money to pay for it'—-meaning Mrs. Bane and John Bane the plaintiffs. I know of an evidence of indebtedness held by Mr. Gill before his death against Mr. and Mrs. Bane, the plaintiffs. It was a note made in 1891 in the sum of $2,000. Mr. Gill asked me to figure up the note and the interest on it. I think it was at the time the will was made—May, 1899. I had the note in my hands at the time, and it was signed 'John Bane,' and 'Belle Bane.' I made a memorandum of the amount due at the time, but do not know what became of it. In 1895 I made a general memorandum of all his notes. All the notes and papers of Mr. Gill came into my possession, after his death, as administrator. I did not find this note signed John Bane and Belle Bane among the papers. When I figured up the note and interest some time between May and the time of his death, it amounted to $1,700 or $1,800. Some time about the month of May I told Mrs. Bane what Mr. Gill had said to me— what he had made up his mind to do in regard to the note—and gave her the whole conversation, and told her that I was satisfied that he intended to give her that note, from what he had said to me, for services in his last sickness. I simply said to her that in fact I was very glad that she was going to get the note. I thought that it was no more than right that she should have it, and she said, 'Well, all right; if he did not give it to her, she would work some way, and pay it off.' I brought the matter up here again in Caldwell when this proposed note was handed to me in my office some time in November of last year. I asked Mrs. Bane if that $1,800 note against her and her husband did not belong to L. D. Gill as well as to Merv.; in other words, if it did not belong to the L. D. Gill estate. No, she said, it did not; that it was Merv.'s, and belonged to Merv. personally;

but said that Mr. L. D. Gill went over with Bane, her husband, to Boise, when the deal was closed up for which the note was given. In May, when we were talking of this $1,800 note, owed by her and her husband, she did not mention anything about having a note against M. H. Gill, and did not state anything about M. H. Gill owing her anything. There was some borrowed money owed by Mr. and Mrs. Bane to Gill, amounting to about $240. There was no written evidence of the indebtedness. I had a talk with Mrs. and Mr. Bane in regard to it right after the funeral of Mr. Gill—the evening of the funeral. There was also an amount due on a county warrant of $521. Before Mr. Gill's death he sent a warrant for that amount over to Caldwell by Mr. Bane, to be collected, and placed in the bank to Mr. Gill's credit. I saw Mr. Bane standing there at the gate of the old home, and told him that, 'Before Mr. Gill's death he said that you owed $240 or $250,' and Mr. Bane called to his wife, Belle Bane, the other plaintiff herein, and asked her how much was that that she got from Mery, long ago, and she said, '$240'; and then I said, 'the only difference between you is $240?' and they said, 'Yes.' I said that there was a certificate that Mr. Gill was worrying about before he died—a $390 warrant he sent over, with interest—and asked what became of it, and John Bane said that Gill told him he could use the money, and I said, 'That is very strange, as he worried about it not coming over, and asked where it was'; and Bane said, 'I will try to meet you in Caldwell on Monday, and pay it.' This was on Friday or Saturday. So I said, 'All right.' After I had got a short ways below Emmett, on my way home, I heard a team coming behind me at a rapid gait, and slow up, and Mr. Bane drove up. He said, 'Here is a check for that warrant, $550; so I gave him the difference between $521 and $550, the amount that was due; so he gave me McNish and Allen's check for $550. I again said then, 'The only difference between you and Mr. Gill at this time is $240?' and he said, 'Yes;' and he said, 'I will pay that as soon as I sell some hay'; and I said, 'All right.' During the first conversation in regard to the borrowed money and the warrant Mrs. Bane was present; so was J. M. Martin. Mrs. Gwinn was present when he paid me the $550. John Bane said that Mrs. Bane

got the $240 from Gill. Just before Mr. Gill's death he made a
statement to me in regard to the amounts that he owed; he seek-
ing to inform me of his affairs, and settle up all his indebted-
ness before his death, as he told me at the time that he could not'
live very long. When he sent for me to make his will, he said
he could' not live through the summer, and that he wanted to
straighten everything up. The Sunday before his death on
Tuesday he insisted on my going over to town and getting the
bills that he owed, so that he could pay them. (Counsel for
plaintiffs move to strike out the above answer, commencing with
'Just before Mr. Gill's death,' as immaterial, and irrelevant, and
hearsay.) The Court: It may be stricken out, except his state-
ment as to the apprehension of death, and disregarded by the
jury. (To which ruling of the court counsel for defendant
then and there excepted, and assigns the said exception as one
of the grounds for new trial herein.' (Witness resumes) : **Mr.**
Gill said on Sunday previous to his death that he could not live
but a few days, and he made a statement to me in regard to the
amount he owed and as to whom he owed. Q. Did he state on
that occasion whether or not he was indebted to Mr. or Mrs.
Bane, or both of them? A. He made a statement to me of what
was owing to him at the time he named me as executor."

It seems from the evidence that deceased had been an invalid
for several years prior to his death, and for several months im-
mediately preceding his death he was confined most of the time
to his bed. Under these circumstances it would seem as though
a comparison of the contested signatures with others made by
deceased at or near the time when the contested signature was
alleged to have been made would have been much more satisfac-
tory. Take the signature to the will made on the twelfth day
of May, 1899 (about two months prior to the death of deceased),
and the signature to the tax statement made on June 2, 1899
(less than two months prior to his death), and compare them
with the contested signature, and the variance is- so palpably
apparent as to be observable upon casual inspection. The con-
tested signature is alleged to have been made on May 29, 1899.
The deceased, by reason of his enfeebled condition, as well as on
account of his somewhat limited education, had for some years

been compelled to trust his business affair largely to others. Mr. Howard Sebree, one of the principal witnesses for plaintiffs, states that from about 1895 to the time of his death the defendant attended to the business of deceased. The defendant seems to have been the trusted friend and confidential adviser of deceased. He not only managed his affairs, but, when admonished that he was approaching his end, he sends for defendant to prepare his will, and make a final adjustment of his affairs. Deceased talked with defendant fully and freely concerning the obligations he felt himself under to the plaintiff Belle Bane for her care and kindness to him during his last illness, expressed his desire and intention to reward her liberally therefor, and in fulfillment of such desire and intention gave to her a note of herself and husband for some $1,700 or $1,800; and, when asked by defendant what price he placed upon the home ranch, deceased stated that Belle (the plaintiff) could have it for $4,000, but to any one else the price would be $4,500. In the several conversations had with the defendant both prior to the death of the decedent and immediately thereafter, although their attention was repeatedly called to the subject, the plaintiffs stated that the $240 and the amount due upon the county warrant of some $521, both of which sums were paid by plaintiffs subsequent to the death of decedent, and no word said about any claim against his estate, covered all transactions between plaintiffs and decedent. The decedent was a man of simple, frugal habits, and seems to have been possessed with an almost morbid dislike of incurring a pecuniary obligation. The record contains no evidence of his ever having given his note to any one, or for any purpose, aside from that in question. That a man of the disposition and habits of the decedent should have executed a note of an amount sufficient, if not to defeat, to at least greatly embarrass, the carrying out of his wishes and purposes as expressed in his last will, made only a few days before, and should, moreover, never mention the fact to his friend and adviser, the man whom he had not only intrusted implicitly with his affairs for years, and whom he had selected to carry out his wishes in regard to the disposition of his estate after he was gone, is a conclusion so utterly inconsistent with all the record

shows us of the life and habits of the decedent as to require something more to support it than the opinion of experts, such as is shown by this record.

We do not find any reversible error in the rulings of the trial court in the matter of admitting or excluding evidence or in the instructions. This is not, strictly speaking, a case of "conflict of evidence." The only conflict is in the difference of opinion of the various witnesses upon the question of handwriting. There does not appear to be any appreciable conflict upon any other evidence in the case, and we cannot affirm a judgment based upon a verdict which, in our view, is so contrary to the evidence in the case. The judgment of the district court is reversed, and cause remanded for a new trial; costs to the appellant.

Quarles and Sullivan, JJ., concur.