In re VARNEY (two cases).*

District Court, E. D. Kentucky. July 22, 1927.

1. Bankruptcy ⟨⟩342½—Referee's finding of fact, on conflicting testimony, in expunging or allowing claim, is not disturbed, unless it can be shown he was wrong.

On petition for review of order of referee in bankruptcy expunging or allowing a claim, his finding of pure fact, as to genuineness of signatures, based on conflicting evidence, and involving questions of credibility, should not be disturbed, unless it can be shown by well-reasoned opinion that he was wrong.

2. Bankruptcy ⟨⟩340(5)—Claimant has burden of proof, though sworn proof of claim makes prima facie case, shifting burden of evidence.

Burden of proof to establish claim against bankrupt's estate is on claimant, though his sworn proof of claim makes out a prima facie case, causing the burden of evidence to shift to trustee, to the extent of offering evidence sufficient to counterbalance the prima facie case.

3. Evidence ⟨⟩590—Credibility of bankrupt, testifying against signature of notes, held affected by interest.

Credibility of bankrupt, as witness against genuineness of her signature to notes filed as claims against the estate, is affected by interest; there being likelihood of something being left to her if the claims are reduced enough.

4. Bankruptcy ⟨⟩340(4)—Such conflict between testimony of bankrupt and others held not to exist as to weaken her credibility, relative to genuineness of signatures.

Such conflict between the testimony of one of two bankrupts, who testified against the genuineness of signatures to indorsements of notes in the names of herself and of her mother, the other bankrupt, and the testimony of a creditor's witness and trustee's expert witness, as to weaken her credibility, held not to exist.

5. Bankruptcy ⟨⟩342½—On petition for review, it will be accepted that witness would have answered in accordance with avowal, if allowed to answer proper question.

On petition for review of order of referee in bankruptcy, he having refused to allow a proper question to be asked, and an avowal then having been made of what witness would have testified, it will be accepted, on petition for review, that he would have so testified, if allowed to answer.

*Decree affirmed 23 F.(2d) —.

**6. Evidence ⬅573—When supported by unimpeached reasoning, handwriting expert's testimony is accepted as valuable.**

Expert opinion evidence as to handwriting is to be accepted as valuable, where supported by detailed reasoning, not shown to be defective.

**7. Evidence ⬅573—Expert's opinion on handwriting, without reasoning, is of little value.**

Expert's opinion on handwriting, without giving the reasoning on which it is based, is of little value.

**8. Witnesses ⬅406—Testimony that witness signed only four notes is indirect contradiction of testimony that she signed more.**

Testimony of bankrupt that she and her mother, the other bankrupt, signed only four of certain notes, is an indirect contradiction of the testimony of another to the effect that they had signed more of them.

**9. Witnesses ⬅362—That admittedly witness was guilty of forgery rendered valueless his testimony that bankrupts' signatures to notes to him were genuine.**

Testimony of witness that bankrupts' signatures to notes to him were genuine was rendered worthless by the admitted fact that he was guilty of forgery, including other notes of bankrupts.

**10. Bankruptcy ⬅340(4)—That bankrupt had never refused to sign notes for another held insufficient to affect determination of genuineness of their signatures.**

That bankrupts had never refused to sign any note as maker or indorser, when requested to do so by one for whom notes presented against the estate were so signed in the names of bankrupts, *held* insufficient to affect the conclusion to be arrived at, as to whether the signatures were genuine.

**11. Bankruptcy ⬅340(4)—Notes in bankrupts' names held, as found by referee, not genuine, under weight of evidence.**

Weight of evidence *held* to be against genuineness of notes in bankrupts' names, presented against their estates, so that referee's finding in this respect should be approved.

**12. Estoppel ⬅83(5)—Bankrupts and trustee held estopped by their representations to deny genuineness of note as against purchaser.**

Bankrupts, and trustee, are estopped to deny genuineness of note as against purchaser bank, it having by letter describing the note by date, payee, and amount, and stating that it was offered to it asked if it was genuine, and bankrupts having answered that it was; and this, though the note was a forgery exactly like other genuine notes of same date and amount, which they had given same payee.

**13. Estoppel ⬅88(1)—Bankrupts held estopped to deny genuineness of two notes, where bank, after buying one, but before buying other, submitted them to bankrupts, who admitted them were genuine.**

Where bank discounted a note executed in names of bankrupts, and shortly afterwards, on like note being offered, refused to take it unless verified by bankrupts, and both notes were then submitted to bankrupts, and were admitted by them to be genuine, *held*, they are estopped to deny their genuineness.

In Bankruptcy. Two proceedings, one in the matter of Nancy Jane Varney, bankrupt, and the other in the matter of Pricy A. Varney, bankrupt. Heard on petitions for review, one complaining of order of referee expunging claims, and the other complaining of his order allowing a claim. Petitions overruled, and orders approved and confirmed.

Browning & Reed, of Ashland, Ky., for trustee.

Randolph Bias, of Williamson, W. Va., for Louisa Nat. Bank, Louisa, Ky., Merchants' & Miners' Bank of Welch, W. Va., Kermit State Bank, of Kermit, W. Va., and J. M. Smith.

J. R. Johnson, of Pikeville, Ky., and Martin & Smith, of Catlettsburg, Ky., for Day & Night Nat. Bank of Pikeville, Ky.

ANDREW M. J. COCHRAN, District Judge. These two proceedings are before me on separate petitions for review, filed by the Merchants' & Miners' Bank, of Welch, W. Va., the Kermit State Bank, of Kermit, W. Va., J. M. Smith and Mrs. Freelove Hurst, complaining of an order of the referee expunging claims filed therein by them, and on a petition for review, filed by the trustee, complaining of an order allowing a claim, filed by the Louisa National Bank, of Louisa, Ky., and two claims, filed by the Day & Night National Bank of Pikeville, Ky. Each of the claims expunged, except that of Mrs. Freelove Hurst, and each of the three claims allowed, was based upon a note for $6,000, dated December 26, 1924, due in one year, or 12 months, payable to W. P. T. Varney, and indorsed by him, purporting to have been signed by those two bankrupts. The claim of Mrs. Freelove Hurst was based upon a note for $4,000, dated December 22, 1924, due in 4 months, payable to the bankrupt Nancy Jane Varney, and purporting to be indorsed by her and the bankrupt Pricy A. Varney, executed by W. P. T. Varney, payee and indorser of the other six notes. The trustee objected to all seven of the claims, and moved their expunction, on the ground that as to those based on the $6,000 notes the signatures of the bankrupt thereto were not their acts and deeds, and as to the $4,000 note that their indorsements thereof were not their acts and deeds. The referee so adjudged, but allowed the claims of the Louisa National Bank and the Day & Night National Bank of Pikeville, based on the $6,000 notes held by them, on the ground that the bankrupts and the trustee were estopped to deny the genuineness of the signatures of the bankrupts thereto.

The bankrupts are daughter and mother, and lived on Pond creek, in Pike county, in this district, not far from Williamson, W. Va. They owned a valuable coal lease as lessors, their interest therein being successive life estates; i. e., first an estate for life in the bankrupt Pricy A. Varney, and then such an estate in the bankrupt Nancy Jane Varney. Possibly the interest of the latter is a fee simple. W. P. T. Varney, payee and indorser of the six $6,000 notes and maker of the $4,000 note, had official connection with the Day & Night Bank of Williamson, W. Va., which failed in the spring of 1925. He had had connection and control previously to that time, but had been ousted, and just before the failure had succeeded in reinstating himself. To assist him in his effort to maintain himself in his position, the bankrupts had given him their paper in various sums, which together amounted to a considerable amount. They admit giving him four other $6,000 notes, dated December 26, 1924; and after the failure of the bank they indorsed his note for $38,000, which I have held they did to prevent a criminal prosecution against him, which holding is questioned in the Circuit Court of Appeals. He is now in the penitentiary of West Virginia for an offense or offenses committed in connection with the Williamson Bank. These are the general aspects of this case.

The first question to be determined is whether the signatures of the bankrupts on the seven notes in question were their acts and deeds. If they were, then the orders of the referee complained of by the four petitioning complainants should be reversed, and that complained of by the trustee approved. If they were not, then the question arises for decision whether the bankrupts, and hence the trustee, are estopped to deny the genuineness of the signatures to the notes allowed.

[1] The question as to such genuineness is one of pure fact. The appellate court of this circuit, in the case of Ohio Valley Bank v. Mack, 163 F. 155, 158, 24 L. R. A. (N. S.) 184, had this to say as to the value of a finding of a referee in bankruptcy on such a question: "But, if the finding is based upon conflicting evidence involving questions of credibility, and the referee has heard the witnesses, much greater weight naturally attaches to his conclusion, and the weight of authority is that the District Judge, while scrutinizing with care his conclusions upon a review, should not disturb his finding, unless there is most cogent evidence of a mistake and miscarriage of justice." This would

seem to be such a case. At any rate, I cannot disturb his finding in this particular, unless I can show by a well-reasoned opinion that he was wrong.

[2] At the outset, the question of where the burden of proof lay is presented, and calls for determination. I think that it is clear that the burden of proof lay on the claimants. The sworn proof of a claim filed in bankruptcy by the claimant makes out a prima facie case. The objection of the trustee to the claim does not require the claimant to go forward and prove his claim. By his sworn proof he has already made out a prima facie case. The effect thereof is to cause the burden of evidence—i. e., of offering evidence—to shift to the trustee. If he does not offer any evidence, the claim should be allowed, notwithstanding his objection. He need do no more than offer evidence sufficient to counterbalance the prima facie case made by the claimant. Of course, if he offers evidence sufficient, not merely to counterbalance the claimant's prima facie case but to overthrow it, the claimant must fail, if he does not offer sufficient evidence to overthrow the trustee's case. It will not be sufficient for him to offer evidence which merely counterbalances that of the trustee. It must overweigh it. This is in accordance with the well-known distinction between the burden of proof and the burden of evidence. The burden of proof never shifts. The burden of evidence—i. e., of offering evidence—may.

The decision of the Supreme Court of the United States in the case of Whitney v. Dresser, 200 U. S. 532, 26 S. Ct. 316, 50 L. Ed. 584, was simply to the effect that the sworn proof of claim filed was sufficient to make out a prima facie case, and that, if the trustee objected to the claim, he must go forward and introduce evidence; otherwise, the claim should be allowed. But it recognized that what shifted by the making out of such prima facie case is, not the burden of proof, but the burden of evidence. The court said: "The only question warranting the appeal is whether the sworn proof of claim is prima facie evidence of its allegations in case it is objected to. It is not a question of the burden of proof in a technical sense, a burden which does not change, whatever the state of the evidence, but simply whether the sworn proof is evidence at all."

The claimants cite the following decisions as supporting the contention that the burden of proof is on the trustee, to wit: In re Coventry Evans Furniture Co. (D. C.) 166 F. 518; In re Montgomery (D. C.) 185 F. 955; In re Schwarz (D. C.) 200 F. 309.

In the Coventry Evans Furniture Co. Case the court said: "A proof of claim which complies with the requirements of section 57 [11 USCA § 93] establishes the claim, entitles it to allowance in the first instance, and throws the burden of overthrowing it on the trustee, when appointed, and on the creditors of the bankrupt, if they would contest. Whitney v. Dresser, 200 U. S. 532, 26 S. Ct. 316, 50 L. Ed. 584, and cases there cited." Here it is said that the proper proof of claim "throws the burden of overthrowing it" on the trustee or creditor, citing Whitney v. Dresser. It was not the intention to go beyond that decision, and the necessities of the case did not require this. All that case decided was that the sworn proof made a prima facie case, and required the trustee to go forward with the evidence. Nothing was said as to the strength of such evidence; i. e., whether it was necessary that it should overthrow such prima facie case, or whether it would be sufficient if it merely counterbalanced it.

The Montgomery Case involved the validity of a note purporting to be that of the bankrupt. The trustee objected to the claim based on the note, on the ground that it was a forgery. The referee held that the burden of proof was on the claimant. The District Court held that he erred, but that the error was harmless, in that the trustee had established by a greater weight of evidence that the note was a forgery. But it is evident that what the court meant by holding that the referee erred in holding that the burden of proof was on the claimant was, simply, that the sworn proof of his claim was not sufficient to make a prima facie case, and that he had to offer additional evidence on objection made by the trustee. The referee required the claimant to go forward with its proof, and after it had done so the trustee offered proof. This was the course of procedure followed. This was erroneous, and this is all that the court meant to hold.

In the Schwarz Case it was said: "The presentation of a note, accompanied by a duly verified claim, constitutes a prima facie establishment of the claim in bankruptcy, and puts the burden of furnishing some evidence to rebut the same on an objecting creditor." Here nothing is said as to the burden of proof. All that is held is that the burden of evidence shifts to the objecting creditor on the filing of a properly sworn claim.

On the other hand, in the case of Youroveta Home & Foreign Trade Co. (C. C. A.) 297 F. 723, the matter was put right. It was there said: "The common statement of the rule in matters like this is that, under Whitney v. Dresser, 200 U. S. 532, 26 S. Ct. 316, 50 L. Ed. 584, a sworn proof of claim puts the 'burden of proof' on the objecting trustee. This is not an accurate statement, for, as Holmes, J., remarked in the case cited, the question is 'whether the sworn proof of claim is prima facie evidence of its allegations in case it is objected to. It is not a question of the burden of proof in a technical sense, a burden which does not change, whatever the state of the evidence, but * * * whether the sworn proof is evidence at all.'" That in an action at law on a note, in case of a plea of non est factum, the burden of proof is on the plaintiff, is well settled. 8 C. J. 998. There is no reason why this same rule should not prevail in bankruptcy.

Here the proper practice was pursued. The trustee first went forward with his evidence, and after he was through the claimants introduced their evidence. I do not think that it makes any difference in this case as to where the burden of proof lay. But it is well to look at it from the proper viewpoint.

The evidence on behalf of the trustee consisted of the testimony of the bankrupt, Nancy Jane Varney, of a professional handwriting expert, and of a banker from Maysville. The bankrupt, Pricy A. Varney, was unable to testify on account of age and physical disability. The bankrupt, Nancy Jane Varney, testified positively that neither she nor the other bankrupt, her mother, signed either of the notes in dispute. The expert and the banker testified that in their opinion none of the signatures was genuine. The expert gave in great detail the reasons for his opinion. In addition thereto it may be said that the trustee's case is supported by the notes themselves when compared with admitted or proven signatures introduced in evidence. The claimants introduced evidence consisting of the testimony of five bankers living and in business not far away from the bankrupts' place of residence and of W. P. T. Varney. The bank of one of them holds genuine notes against the bankrupts for $18,000 and another was a teller in a bank at Williamson where an account was kept in the name of Pricy A. Varney by Nancy Jane Varney, which gave him a more or less familiarity with the handwriting of Nancy Jane Varney. Each of these witnesses testified that in their opinion the signatures of both bankrupts to each disputed note was genuine. Neither one of them gave any reason for his opinion. Neither one of the

notes was submitted to W. P. T. Varney when he testified, but his testimony went to support the genuineness of the disputed signatures.

[3] The question, then, which this case presents, is whether the opinions of these five bankers, unsupported by any reasoning, and that of W. P. T. Varney, overweighs the positive denial of the bankrupt Nancy Jane Varney, the opinion of the professional handwriting expert, supported by reasoning, the opinion of the Maysville banker, like that of claimants' bankers unsupported by any reasoning, and such showing as the notes themselves make when compared with the genuine signatures. The claimants urge that the credibility of the witness Nancy Jane Varney is affected by interest. It must be accepted that this is so. If the claims against the estate are reduced enough, there is a likelihood of something being left for her, if not for her mother.

[4] They claim, also, that it is affected by contradictions in certain particulars between her testimony and that of Isadore Steckler, and between her testimony and that of the expert. At the time of the failure of the Williamson Bank, the Bluefield National Bank held a note for $10,000, signed by the Tug Valley Fuel Company, payable to W. P. T. Varney, and indorsed by the two bankrupts. There were rumors of some forgeries having been committed by W. P. T. Varney, and that bank had some forged paper, presumably traceable to him, and at the instance of the bank Steckler took them to the bankrupts at their home, to find out whether their indorsements were genuine, and to get them to reindorse them, which they did. The contradiction relied on is this: It is claimed that Steckler testified that Nancy Jane Varney on this occasion admitted that the indorsements were genuine, and she testified that she did not so admit. It is questionable whether there was any such contradiction. She testified squarely that Steckler did not ask her if the indorsements were genuine, and she did not say that they were. All he asked her was that she and her mother reindorse the notes, which they did. Steckler was asked the direct question, "What did Nancy Jane Varney say as to its being her signature?" He answered, "Well, I can tell you more about it—" Then, without permitting him to answer the question further in his own way, this question was put to him, "Did she, or not, admit that she had written her name on it that was then on the note when you got there?" He answered, "Yes, sir.". He was not asked whether she was asked whether the signatures were genuine, and what she said on the subject, simply whether she admitted them to be their signatures. Possibly her act of reindorsing the note may have been looked upon by him as such an admission.

But, however this may be, they differed in another particular, in which it would seem that she was right. The note as presented to her contained the indorsements of the two bankrupts twice. One set of the indorsements is at the bottom, and is preceded by four other indorsements, to wit, W. P. T. Varney, the payee, P. A. West, Andy New, Jr., K. L. Varney, and J. T. Johnson. The other set is at the top. Steckler testified that the set at the bottom constituted the new indorsements; whereas she testified that the set at the top were the new ones. According to this, when their names were first indorsed, they were placed ahead of the indorsement of the payee, when the proper place was after it. Much importance, perhaps, cannot be attached to this circumstance, as in the case of the $2,400 notes, hereinafter referred to, indorsements of the bankrupts were placed ahead of the indorsement of the payee, W. P. T. Varney. But she testified that Steckler said, "Sign them right across the top." This statement has the ring of truth in it. Besides, the top signatures resemble the admittedly genuine signatures, and the bottom do not. They resemble the disputed ones. Instead of this conflict between her and Steckler weakening her credibility, it seems to me to strengthen it.

[5] The claimed contradiction between her testimony and that of the expert is this: In October, 1924, Fred H. Varney, who makes his home with the bankrupts and attended to matters on their behalf, executed a series of $2,400 notes to W. P. T. Varney, which were indorsed by him and the bankrupts. Four of them were introduced in evidence and are in the record before me. The indorsements of the bankrupt Pricy A. Varney was made by the bankrupt Nancy Jane Varney. They have an additional indorsement by the former. These three indorsements were ahead of the indorsement by W. P. T. Varney, the payee, which circumstance I have heretofore referred to. The expert was asked whether the second indorsement of Pricy A. Varney's name was her signature. Objection was made to the question, and the referee refused to allow him to answer. I think that it was a proper question, and that he should have been allowed to answer. An avowal was made that, if he had been allowed to do so, he would have said that the signatures

were genuine. It should be accepted that such would have been his answer, had he been permitted to answer. It is evidence that they were genuine.

It is claimed that the bankrupt Nancy Jane Varney, when questioned as to the genuineness of these signatures, denied that they were genuine. She had been asked on cross-examination about the indorsement on the notes of her mother's name, which she had made, and answered that she had made them. On redirect examination she was asked whether, after these indorsements, the notes had been presented to her and her mother for further indorsement, and she answered that they had not. Up to this time none of the notes had been presented to her in the course of her examination, in order that she might examine the signatures. On recross-examination three of them were for the first time presented to her, and it is then that it is claimed that she denied the genuineness of the additional signature of her mother's name. When asked about one of them, she said that it was not her mother's indorsement. When asked if she was sure as to this, she said, "This one looks somewhat like her signature, this one; that one is very, very different." She was then asked, "How many of them bear the genuine indorsement or signature of your mother, made by her?" Her answer was, "Well, I should say the second one, the one in the middle, looks somewhat like hers, like it might be."

It would seem that possibly there were as many as 12 of these notes, and they were all exhibited to her. But there are only 4 of them before me, and there is reason to think that only 3 of them were exhibited to her. At any rate, she was asked this question, "How many of the 12 look like they might be her handwriting?" Her answer was, "A number of them imitate it, and part of them are; anybody can look at it." She was then asked, "How does it happen your mother's name got on there again on these three notes?" Her answer was, "I don't remember." These questions and answers were then asked her:

"Are you certain, as to any of the three notes, as to whether any of the other two indorsements are hers, are your mother's, and as to which one is hers, or as to whether any of them are hers? A. I don't know that either one of them is hers, but that one in the middle. I said it looks more than any like hers.

"Q. You say it is a better job of forgery than the other two? A. Yes, sir; I do.

"Q. Are you sure of it? A. I am quite sure. In fact, I know they are."

Now, it is evident from all this that the fact of the reindorsement of her mother's name by her mother herself had entirely escaped her mind and she was somewhat confused when they were presented to her. Though at first she was disposed to deny the genuineness of all of them, in the end she did not deny positively that any one of them was genuine, and was inclined to admit that one of them was. Besides, the indorsements are poor specimens of her handwriting, due possibly to the fact that she was cramped in writing her name in between her name as it had been written by her daughter and the name of W. P. T. Varney, the payee. I can see nothing here that to the slightest extent affects her credibility. The only thing which does affect it is her interest; and it must be said that this does affect it, and that very seriously. There is a saying to the effect that, when self shakes the balance, it is rarely rightly adjusted. $40,000, the amount of these notes, is a big sum of money. Yet there are persons who will not swear falsely for any sum of money. I cannot say that she is not one of those persons; and there is no occasion for me to strain after putting her out of that class. She and her mother were most shamefully abused by W. P. T. Varney.

[6] The position of the claimants as to the testimony of the expert is practically that no attention whatever should be paid to it. It would have the court brush it aside as unworthy of consideration. They base this on the notion that he was paid for his services, which payment, however, did not depend on the result of the litigation. They quote from the case of Strode v. Strode, 194 Ky. 665, 240 S. W. 368, 27 A. L. R. 313, this statement: "Such testimony, as has often been held, is of the weakest character, and should be received and weighed with great caution." And from the case of Bane v. Gwinn, 7 Idaho, 439, 63 P. 634, this statement: "In fact, we think we are not far from expressing the consensus of judicial opinion when we say that of all testimony upon which courts are called to pass, that of expert witnesses upon questions of handwriting is the most unsatisfactory." They quote, also, an extended statement from 22 C. J. § 825, p. 735, which is quite depreciatory.

But they also quote from the case of Adams v. Ristine, 138 Va. 273, 122 S. E. 126, 31 A. L. R. 1413, this statement: "Opinion evidence as to handwriting is valuable when direct evidence of a reliable and satisfactory character as to the factum cannot be obtained; but it is subject to many abuses and is of a dangerous nature, especially when

given by experts in the employment of, and paid by, parties offering it."

This would seem to be the case here. The claimants urge that the testimony of the bankrupt Nancy Jane Varney as to the factum cannot be accepted because of interest. The only other witness as to the factum is W. P. T. Varney, and he is in the penitentiary for forgery, and in one or more instances, as will appear later, did forge the names of the bankrupts to commercial paper. The trustee, on the other hand, quotes a rather favorable view of such testimony from an article by Prof. Roscoe Pound in the Harvard Law Review. He also quotes from the case of Venuto v. Lizzo, 148 App. Div. 164, 132 N. Y. S. 1066, this statement: "While the testimony of expert witnesses is carefully weighed and accepted with caution, the law allows such evidence. The conclusion of a handwriting expert as to the genuineness of a signature, standing alone, would be of little or no value; but, supported by sufficiently cogent reasons, his testimony might amount almost to a demonstration."

Here the witness in question supported his opinion that the disputed signatures were forgeries by very detailed reasoning; and it has not been pointed out that this reasoning is defective in a single particular. These criticisms alone are made:

(1) There are 188 letters in the signatures to the eight notes. According to his testimony, not one of these letters was like any one of the letters in the genuine signatures. This position, it is urged, is remarkable, and so remarkable that it renders his opinion valueless. I have not verified this claim as to his testimony; but the fact, if true, does not affect his opinion, unless it is untrue. If it is not untrue, the fact that such is the case may be remarkable; but the position that such is not the case is not remarkable. Now, the claimants have not undertaken to point out a single instance where a single letter of the disputed signatures is like any letter of the genuine signatures; and I do not feel called on to make an independent investigation on this subject.

(2) Again, it is said that according to the witness there were two forgers, one who forged the signatures of Nancy Jane Varney, and another who forged that of Pricy A. Varney. This they claim is unreasonable, and it discredits all his testimony. I am unable to see anything unreasonable in this. The books are full of conspiracy cases. In every such case at least two acted together in committing or attempting to commit a crime. It seems to me that it would help to carry out the purpose in view to have two forgers, instead of one.

(3) Still further it is urged that there are as many differences between the letters in the genuine signatures as between those letters and the letters of the disputed signatures, and they were unable to get the witness to frankly admit this. The claimants have not undertaken to show that there were as many differences as claimed, and I am not called on to take the pains to find out whether this is so. I am unable to find any indications of unwillingness or hesitancy on the part of the witness in answering questions as to this matter. But, if it be true that such is the case, it is unimportant. The question is whether the genuine signatures are substantially alike, and the disputed signatures are substantially unlike the genuine. This question is unaffected by the existence of such differences.

So it is that the entire body of the witness' reasoning in all its details stands unaffected by any defect in it. Such being the case, in the language of the Virginia case, it must be accepted as valuable. My criticism of this witness' testimony is that there is too much learning in it, and it does not present the matter as it appears to a casual observer. In the case of Strode v. Strode, supra, the court said: "No one can make the comparison [i. e., between the disputed and the admitted signatures] without concluding that the general appearance of the writings is the same, and a casual observer would no doubt unhesitatingly pronounce them as executed by the same person."

The expert did not undertake to present the general appearance of things—just how the matter strikes one like myself, holding the disputed and genuine together, to determine whether they are or are not substantially alike. He presented it as things appeared to him after days of study and the use of the instruments which experts avail themselves of in reaching their conclusions. All the results are mixed up together, without any separation of the important from the unimportant. This has made it an extremely difficult job to master it all; so difficult that I have not undertaken to do this. I did not have the patience to do this, and I did not think that the case called for such patience. It was easier for the referee to understand his testimony than myself, as he had the advantage of the witness pointing out to him the matters testified to by him, and the opportunity of asking explanation of terms used. This is one consideration that leads me to defer to his opinion.

So far as the testimony of the Maysville

banker is concerned, it has as much value certainly as that of the bankers who ·testified on claimants' behalf, other than the teller in the Williamson Bank and the representative of the bank which is an undisputed creditor of the bankrupts. When it comes to a comparison of the disputed documents with the genuine, I have no help whatsoever from the claimants; and the expert has not helped me as much as he might have done so, had he pursued the course indicated above. Yet there are some matters which seem to me fairly certain. In the case of Pricy A. Varney I propose to compare simply the capital letters in her name. The "P's" in the genuine signature, of which there are 15 in the record before me, are invariably made so that the ascending curve crosses the stem below its top, except in a single instance—i. e., the $10,000 note held by the Bluefield National Bank—and there that curve rests on the top. This is not true in either one of the eight disputed signatures. In the eight I include the bottom signature in the $10,000. In each instance that curve crosses over and above—sometimes a considerable distance above—the top of the stem. In the genuine "A's" in every instance the second stem never comes down as low as the first; almost invariably it comes no lower than the crossover or connection between the two, and that connection is made by· ascending from the inside of the second stem. In the disputed signatures, except in a single instance, the second stem comes down as low, if not lower, than the first, and the crossover and connection is made ascending from the outside of the second stem. The genuine "V's" tilt, oftentimes considerably, to the right. In the disputed signatures, such is not the case.

Nancy Jane Varney writes a good hand. In the genuine signatures, of which there are 46 or 47, there is no indication of restraint anywhere in it. Her writing is free and flowing. It is perfectly natural. On the other hand, the eight disputed signatures appear artificial, as if made under restraint. They are not free and flowing, as are the genuine signatures. But two characteristics of the letters will be noted, to wit, in the capitals "N" and "V". Her capital "N" is an enlarged small "n." It begins with, as I take it, what the expert calls an undercurve, and loop is formed by the first downward movement and the following upward movement. This is the case in every instance. I do not find these characteristics in the disputed signatures. In the case of the "V's," the first downward movement is not preceded by any mark, and it is shorter than the following upward movement. This

is the case in every instance. She signed her mother's name 12 times to her mother's schedule attached to her petition in bankruptcy. And the "V's" in her mother's name, as thus signed, have these characteristics. In each instance of the disputed signatures, the downward movement is preceded by a turn in, slighter in some cases than others, and each downward movement is as high as the following upward movement.

[7] Such is what I gather from a close comparison of the genuine and disputed signatures. I have not had the benefit of any discussion on part of counsel as to these matters; and what the expert has to say on these subjects is buried in a mass of detail, and, as stated, I have not had the patience to sit up with it and dig it out. The result of this comparison in my mind weighs heavily against the genuineness of the disputed signatures. As to the testimony of the five bankers, relied on by the claimants, it is greatly weakened by the consideration that not one of them gave a reason for the faith that was in him. They simply expressed the bald opinion that the signatures were genuine. These witnesses may be termed business experts, as distinguished from professional experts.

Wigmore would seem to think that an expert's opinion, without the reasoning on which it is based, is of but little value. In Wigmore on Evidence, vol. 3, § 2014, it is stated: "On direct examination the witness may, and if required must, point out his ground for belief in the identity of the handwriting on the principle already considered. Ante, § 655. Without such a reinforcement of testimony, the opinions of experts would usually involve little more than a counting of the numbers on either side." I was entitled to have the basis of the opinions of those bankers, in order that it might test their soundness, and this has· not been afforded me. I never like to follow any one blindly.

[8] This brings me to the testimony of W. P. T. Varney. He testified that on two occasions he had delivered to Fred H. Varney a bunch of $6,000 notes, and he had, on one occasion delivered a bunch thereof to the bankrupt Nancy Jane Varney, all dated December 26, 1924, to be signed by the bankrupts. This he did within the last two weeks of 1924 and the first two or three days of 1925, and the notes were returned to him signed. There were 18 in all of such notes so delivered, and the ones in dispute were a part thereof. He only used 11 of them, and destroyed the others at the time of the failure. He did not see any of them signed.

He seemed to emphasize this fact. Nor were any of them exhibited to him, and he asked as to whether the signatures were genuine. Possibly his testimony was to the effect that the signatures to those used were all genuine, though he does not seem to have been asked that direct question. Point is made of the fact that the bankrupt Nancy Jane Varney was not asked as to the truth of this testimony, and she did not deny it in any particular. But her testimony was direct to the effect that she and her mother only signed 4 of such $6,000 notes, and this is an indirect contradiction of the testimony of W. P. T. Varney, which tended to show that they had signed more than 4.

It is urged that he further testified that, in the case of the note held by the claimant, Merchants' & Miners' Bank of Welch, W. Va., when it was presented by him to that bank for negotiation, or possibly after negotiation, the bank questioned the signature of the mother, whose name had been signed by the daughter, and he had another note, which he delivered to the latter for that purpose, signed by both of them; and this same thing happened in the case of the note negotiated about that time to the First National Bank of Williamson, and that the bankrupt Nancy Jane Varney did not deny this testimony. This may have been due to the fact that she was not asked about it. But it is rather strange that the bankrupt Nancy Jane Varney should sign her mother's name to this particular $6,000 note, and her mother should sign her own name to all the others. How is this to be accounted for?

The other instance in which it is claimed that she signed her mother's name was in the case of the $2,400 notes, and I must say that in my judgment she did not sign her mother's name in those instances. She signed her mother's name 12 times to schedules attached to her mother's petition in bankruptcy. Now, the signatures of her mother's name on the back of the four $2,400 notes in evidence, which it is claimed were signed by her, are totally unlike the signatures thereof to the schedule. Take the "A" for her mother's middle name. As she signed it to the schedules, it is an enlarged small "a"; whereas, as signed on the back of the $2,400 notes, it is a capital "A." Then compare the "Varney" in her own names on the back of those notes, which names were signed by her, with the "Varney" in her mother's name just below them, which it is claimed she signed. There is no resemblance between them. It may be that, when she denied that her mother indorsed these notes, she had her attention addressed to these signatures, which were evidently signed by some one else, other than herself and her mother.

[9] This is the testimony of W. P. T. Varney. It is rendered valueless by the fact that it is admitted that he was guilty of forgery in connection with his bank, which failed. I gather that the offense for which he is in the penitentiary was forgery. He forged the name of J. M. Smith, one of the claimants to paper held by the bank. He forged the names of the bankrupts to other paper. Their names were forged by him to a $3,275 note sued on in this court and determined by it to be a forgery. He was asked on cross-examination whether he had not forged some of the stock of his bank, which failed, and he declined to answer. He also declined to answer the question whether he had not signed the names of the bankrupts to paper without their authority.

[10] It is urged that the bankrupts never refused to sign any note as maker or indorser, when requested to do so by W. P. T. Varney, and that is the strongest possible argument that the notes in question are genuine. Why forge, when the signatures could be readily obtained? I do not know. Possibly he was afraid to overdo the matter. This consideration is not sufficient to affect the conclusion that should be arrived at in this case.

[11] I have aimed to survey all the evidence in this case bearing on the question of genuineness of the questioned documents, and to address myself to every question made in regard to it, and I feel constrained to hold that the weight of the evidence is against the genuineness of those documents, and that the finding of the referee in this particular should be approved.

[12] It remains to dispose of the trustee's petition; and, first as to the claim of the Louisa National Bank of Louisa: One of the disputed $6,000 notes was offered to it for discount. On June 15, 1925, the bank, before discounting it, wrote to the bankrupts a letter of inquiry in regard to it. It said: "We have been to-day offered your note, dated December 26, 1924, due December 26, 1925, for $6,000. This note is given to W. P. T. Varney. We are writing to inquire if this note is genuine, and if there would be at maturity any plea or offset of any kind, and if you will be in a position to take up the note promptly at that date. We will thank you for a prompt reply in the inclosed envelope, as there is a deal being held open until your reply is received."

They answered on January 16, 1925, as follows: "In reply to your letter, we beg to advise that our note, given to Mr. W. P.

T. Varney, dated December 26, 1924, for $6,000, is genuine, and the same will be promptly taken up by December 26, 1925."

The trustee claims that neither the bankrupts nor he is estopped to deny the genuineness of this note, because the bankrupts had delivered to W. P. T. Varney four $6,000 notes and they, not seeing the note, supposed that this note was one of the four. They had no idea that it was a forged note. The question which this presents is whether, if one is asked by another, to whom a particular note is offered for sale as his note, he, without asking to see it before answering, responds that it is, can he thereafter claim that it is not? There would seem to be but one answer to this, and that is that he cannot. Authorities are cited by the trustee to the effect that a forged note cannot be ratified. They are not in point. The claimant is not relying on ratification. It is relying on estoppel.

On this question the case relied on of J. B. Watkins Land & Mortgage Co. v. Howeth, 1 Tex. Civ. App. 277, 21 S. W. 315, is not in point. There the defendant had executed his note for the purchase money for certain real estate to the grantor. The latter offered a forged note of the defendant for the same amount to the plaintiff for sale. He bought it on the written representation of the defendant that the grantor was "the legal owner and holder of a certain vendor's lien note, dated August 26, 1887, bearing interest at the rate of 10 per cent. per annum and signed" by him. The note was further identified by certain other statements. The representation was not that the note which was offered for sale to the plaintiff was the defendant's note. It was merely that the defendant had executed to the grantor a certain note secured by vendor's lien.

Here the representation was that the very note which was offered to the claimant for sale was genuine. The bankrupt as much as said: The note offered you is not before me, but I know W. P. T. Varney. I can depend on his not offering a forged note for sale. You buy that note, and I will pay it. It would be unjust, after this, to allow her to repudiate the note. The case comes within this statement in Pomeroy's Equity Jurisprudence, vol. 2, § 803, p. 1641, to wit: "When all the varieties of equitable estoppel are compared, it will be found, I think, that the doctrine rests upon the following general principles: When one of two innocent parties—that is, persons each guiltless of an intentional moral wrong—must suffer a loss, it must be borne by that one of them who,

by his conduct, acts, or omissions, has rendered the injury possible."

[13] Then, as to the claim of the Day & Night Bank of Pikeville on the two $6,000 notes held by it: That bank discounted one of these notes on January 1, 1925. Shortly thereafter the second one was offered for discount. The bank refused to take it, unless it was verified by the bankrupts. The bankrupt Nancy Jane Varney went to Pikeville, and the two notes were submitted to her, and were admitted by her to be genuine. She denies that both were submitted, and claims that only one was. The evidence preponderates in favor of the position that both were submitted. Thereupon the bank discounted the second note. This the bank did on the representation that both notes were genuine. It is not a case of ratification, but of estoppel. It would be inequitable to relieve the bankrupts from liability on either note.

My conclusion, therefore, is that all the petitions for review should be overruled, and the orders of the referee, complained of, approved and confirmed.